SARAH SCOTT v. JOHN.FINK AND MARY FINK.

*Revoked will not revived by cancelling later will.*

A will is not revived by the destruction of a subsequent will when the latter or any intermediate will had contained a clause revoking all former wills.

Error to Ingham.    Submitted Nov. 10.    Decided Jan. 12.

APPEAL from probate.    Proponent brings error.    Affirmed.

*J. C. Shields* and *H. P. Henderson* for plaintiff in error. The cancellation of a later will revives a former will if not destroyed: 1 Redf. Wills 308, 312, 321, 375; 1 Jarm. Wills 123, 158; *Linginfetter v. Linginfetter* Hardin (Ky.) 119; *Marsh v. Marsh* 3 Jones (N. C. L.) 77; *Taylor v. Taylor* 2 N. & McC. 482; *Lawson v. Morrison* 2 Dall. 286; *Rudy v. Ulrich* 69 Penn. St. 177.

*M. V. & R. A. Montgomery* for defendants in error.    A will actually revoked can be revived only by re-publication: *Bohanon v. Wolcot* 1 How. (Miss.) 337; *James v. Marvin* 3 Conn. 576; *Major v. Williams* 3 Curt. 453; *Exp. Hellier* 3 Atk. 798; *Walton v. Walton* 7 Johns. Ch. 268; *Goodtitle v. Meredith* 2 M. & S. 12; 1 Powell on Devises 309.

GRAVES, J. Sarah Scott propounded for probate an instrument purporting to be the last will of her father John Fink. Opposition was made by John Fink, the half brother, and by Mary Fink, decedent's widow, and the step-mother of said John and Sarah. The Court of Probate admitted the instrument as decedent's last will, and the contestants appealed from the decision. An issue seems to have been made up in the Circuit Court, but the record fails to explain its shape. Enough appears to indicate that proponent affirmed the instrument in question as the last will of the deceased John Fink, and that the contestants alleged revocation by means of a later will. The form given to the altercation is not important because it is manifest no one was misled. The contest was before a jury and they decided against proponent, and she then brought error.

The surrounding facts are not disputed. At the time of his death the decedent had been three times married. The contestant John was a child by the first wife, and the proponent Sarah a child by the second. There was no issue by the third. In 1869 the decedent removed with the second wife and their daughter Sarah to Williamston in Ingham county and there established his residence on a small place of between seventeen and eighteen acres, the family consisting of the three. His entire estate was worth something more than $10,000 and was all personal except the little farm place just mentioned. Soon after he took up his residence in Williamston, and on the 15th of November, 1870, he made and published the will sought to be established. He brought it home from some place after it had been drawn and executed, and delivered it to his wife who read it and then passed it to her daughter, the proponent, to take care of. After providing for the payment of debts and expenses it purported to give his son, the contestant John, $300 and all the remainder of his property to his then wife, Anna Fink, for life, and remainder in fee to his daughter, the proponent Sarah.

He appointed proponent's mother Anna sole executrix. He subsequently made another will containing similar pro-

visions. It was executed within a year or less after the first. The first will fixed the time for payment of the legacy to John at two years after the testator's death, and the second one extended the time to three years, and also stated by way of explanation for not giving more to John, that the testator had previously helped him. The second will differed in no other respect from the first.

September 1st, 1875, Anna Fink, proponent's mother, died. Shortly after that event decedent made and published a third will. It was drawn by Mr. Smith and the scheme was altered to meet the change which had taken place. The decedent took it home and showed it to his daughter, the proponent, and she read it and he placed it among his private papers. And on that occasion he burned the second will. His daughter, the proponent, was named executrix in the third will. There was no controversy at the trial about the formalities of the first will. Had nothing occurred after its publication to impair it, it must have been regarded as its author's last will. This is virtually conceded.

The proponent was sworn as a witness on the part of contestants, and she testified concerning the second and third wills. Indeed the entire history of the second will was derived from her. She also explained how her father brought home the third will, and how she examined it, and what its provisions were. She testified that she was named executrix; that three hundred dollars were given to her half brother and the remainder to her; that there were no other bequests, and that she cannot tell whether it contained a clause of revocation or not. She also mentioned that there had been rumors of the destruction of the third will. She did not swear it was still extant. On the contrary, she testified that she did not see it destroyed, and that all she knew about its destruction was, that after her father's death the report went out that it was destroyed, but that she did not know from whom.

It is not unworthy of notice that the deposition of proponent established the existence of the third and latest will, and showed that its provisions were inconsistent with the

first, and hence sufficient to work a revocation of it, and moreover, that so far as she knew, it was still in existence. At the conclusion of her evidence, therefore, the third will was presumptively on foot, and there was a *prima facie* case of revocation of the first. But the contestants proceeded with commendable fairness to explain all the facts.

In July, 1876, the decedent intermarried with the contestant, Mary, in Oswego county, New York, and she returned with him to Williamston, where they resided together as husband and wife, until his death. When he went to New York, he carried his third will with his other papers, and showed it to her, and on his return to Williamston, and whilst looking over his papers, he took the will out and handed it to her with the request to put it in the stove and burn it, and she complied, and it was then burned. The proof was positive that it contained a clause of revocation. The testimony of the gentleman who drew it and of his law partner, who knew its contents when it was executed, was in some respects different from that of proponent in relation to its dispositions, but these variances afford no aid to her case on any theory.

That this third will was destroyed by its author is not disputed. The declarations made to his daughter, the proponent, on the occasion of his bringing home the third will and destroying the second, were adduced in evidence, as were also his declarations to his wife, the contestant Mary, on the occasion of requesting her to burn the third will. But the point in the case is whether the cancellation of the third will was sufficient to restore the first. The proponent insists that it was, and the contestants deny it.

There has been much difference of opinion on the question whether the revocation of a second will is of itself sufficient to revive the first. For the last century those maintaining that it is, argued that the second will is without force against the first unless it becomes effective by being allowed to survive the testator, and the opinion of Lord Mansfield in *Harwood v. Goodright* Cowper, 87, is cited as conclusive. That case originated in the Common Pleas, and is fully reported

in 3 Wilson 497. There was a special verdict. No revoca-
tion was found, nor the existence of revocable words, nor
what were the provisions of the second will or any of them.
And the jury stated expressly that they did not find that the
testator cancelled the second will, and that they were alto-
gether ignorant as to what had become of it. The point in
question was not in the case, and Lord Mansfield's observa-
tions, as reported in Cowper, were purely *dicta.*

A little earlier, and in Easter term of the same year, the
King's Bench had the case of *Burtenshaw v. Gilbert* before
it. Cowper 49. One Newenden made his will in 1759, in
duplicate, giving one part to the scrivener to keep, and retain-
ing the other himself. He observed that it did not suit him,
and that he made it to keep his wife easy. His wife died.
Thereafter, and in 1761, he produced the part of the old will
in his possession, and made another will with different
devises. He tore off his name and seal from the part which
was present of the old will, and caused the names of the
witnesses thereto to be cut off. He made some explanations
to the scrivener, and placed the new will in his custody.
Some changes occurred thereafter, and one of the objects of
his bounty died. He sent for the second will, and after-
wards for an attorney to draw another, who however did not
reach him until he was too far gone to do anything. After
his death one part of the first will and the second will were
found together in a paper, both cancelled. The other part
of the first will was found uncancelled in the testator's room,
with other deeds and papers. The question for the court
was whether the first will was revoked. Lord Mansfield
observed, among other things, that " if the testator had died
immediately after he made the new will, whether he had
cancelled the former or not, it would have been revoked;
because at the end of the second will, there is a declaration
by which he revokes all former wills. Besides this he
deliberately cancels that part of the will of 1759 which he
had in his own possession. The facts are too many and too
strong to admit of a question, but that, at the time of making
the second will, the first was upon every principle of law

clearly revoked, and can never be set up again but by a new will." The court takes notice, it is true, of the act of mutilation of the one part of the old will, but the circumstance on which stress is laid is the existence of revocable words in the new will, and there is strong ground for inferring that the result would have been just the same if the act of spoliation of the one part of the old will had not been committed.

In *Goodright on the demise of Glazier v. Glazier*, reported in Burrow 2512, it does not appear that the second will contained a clause of revocation.

There seems to have been a material distinction, and on good ground, between the state of a former will after a second one merely inconsistent with it, and its state after a second one with a declaration expressly revoking it.

In the first case the only chance for the second to operate in revocation of the first, according to the prevalent theories of the courts, was by its coming to a head as an active will, which it could do only by surviving its author. Being the last expression of the decedent and at the same time practically inconsistent with the prior one, the intent to repeal the first by it was to be implied. In case, however, of its being recalled by the testator in his life-time, it could not, on the theory referred to, be taken to have had the effect to do away with its predecessor. Being cut off before having its dispositions of property awakened into life, it could have no affirmative operation through its dispositions upon the estate.

In the second case the written declaration is express and in plain terms immediate and absolute. It is a verbal act done solemnly and deliberately for present effect, and not an act contemplating that future circumstances are to determine whether after all it shall have any force. It is not a needful ingredient of the will. That is perfect without it. The addition of it is a mode of immediate cancellation of prior wills, and quite as unequivocal and unambiguous as many others within the statute whose meaning is open to no controversy. It operates at once, and does not apply as a mere contingent caveat against the objects at which it is aimed.

It revokes them without reserve or qualification. And in case the document with which it is connected is itself revoked, that fact can have no effect as a restoration and republication of former revoked wills.

It is only necessary to glance at the authorities to see that judicial opinion, as already suggested, is not harmonious in regard to this question. Much, no doubt, of the diversity may be traced to variety of legislation, but not all. Upon consideration, the doctrine of *James v. Marvin*, 3 Conn., 576; *Boudinot v. Bradford* 2 Dall. 266, and others holding the same views and ruling in accordance with what has just been expressed, appears to be most consonant with our system and with popular understanding, and at the same time the most reasonable and safe. Having reached this result, it is only necessary to add that the proponent has no occasion to complain of the rulings. She was not prejudiced.

The order of the circuit court should be affirmed with costs.

The other Justices concurred.