ELIZABETH BATES, Appellant, *vs.* JAMES HACKING, Exr.,
Appellee.

### JANUARY 28, 1908.

PRESENT: Douglas, C. J., Dubois, Blodgett, Johnson, and Parkhurst, JJ.

(1) *Revocation of Will.*

A revocation of a prior will by a subsequent one takes effect only when the
latter becomes effective, upon decease of testator; hence, where a will was
executed which contained the usual provision revoking prior wills, which
last will was afterwards destroyed by testator:—

*Held,* that the prior will should be admitted to probate as the last will of
testator.

Cases under the common law and the ecclesiastical rule as to the revocation
and revival of wills collected and discussed, and opinion in *Bates* v. *Hacking,*
28 R. I. 523, affirmed.

PROBATE APPEAL. Heard on motion of appellant for re-
argument, and former opinion affirmed.

DUBOIS, J. After the rendition of our opinion in this case,
28 R. I. 523, the appellant filed a "motion for re-argument"
and afterwards "additional grounds for re-argument," which,
in fact, constituted a re-argument of the case in writing; where-
upon the court made an exhaustive examination of the authori-
ties governing the subject, and is thereby convinced that its
former conclusions are supported by the weight of authority.

It is proper, therefore, in the circumstances, to treat the matter more fully than was deemed to be necessary in our former opinion.

The authority to make a will is purely statutory.

The Statute of wills, 32 Hen. VIII, cap. 1, § 2, contained no provisions on the subject of revocation. In the absence of such provision the courts evolved a set of rules to govern the subject, founded upon the theory that the testator's intention to revoke, whether express or implied, should control. Naturally, in these circumstances, implied revocations became common, and interested parties were sometimes unable to resist the temptation to fabricate evidence of the declarations of the testator for the purpose of defeating his will.

Finally, the injustice of permitting written instruments to be destroyed by oral evidence became so apparent that parliament enacted the statute of frauds; 29 Car. II, cap. 3, whereof sections 6 and 22 related to the revocation of wills and testaments, and our statute referred to in the former opinion is a substantial re-enactment of the essential portions of those sections of the statute of frauds.

It is objected that the remarks of Chief Justice Brayton in *Reese* v. *Court of Probate*, 9 R. I. 435 (1870), relating to the extent to which the cases go, and quoted in our former opinion, are *obiter dicta*, as unnecessary for the determination of the issue before the court, and therefore are of no binding force upon us as a precedent. Admitting the force of the objection, we can not close our understandings to the logical and cogent reasoning employed by the learned chief justice.

The confusion concerning revocation and revival of wills, that is to be found in the decided cases, has arisen from a misconception of the subject. The statute of frauds relating to revocation of wills was passed to *maintain* wills and to prevent their revocation except as therein provided. But even after its passage the courts, ecclesiastical and of common law, did not agree in their interpretations, and the question of the revival of revoked wills was raised and became a potent factor in the confusion; this state of affairs continued in England until the Statute I. Vict. cap. 26, § 22, was passed, which

provided for the revival and republication of revoked wills. Neither the Statute of Victoria nor the civil law which governed the ecclesiastical courts has ever been adopted in Rhode Island.

"A will is an instrument by which a person makes a disposition of his property to take effect after his decease, and which is *in its own nature* ambulatory, and revocable during his life. It is this ambulatory quality which forms the characteristics of wills." I Jarman on Wills, cap. 2.

"So essential a feature of a will is revocability that the insertion, in an instrument which is clearly a will, of a clause providing that it is not to be revoked has no effect whatever in preventing revocation. This quality of the will is what is meant when it is said that the will is ambulatory." Page on Wills, § 50.

As a will must of necessity be ambulatory, it follows that all attempts to restrain its ambulatory quality must fail, for a successful attempt would destroy it. A will must be perfectly free in that regard or it ceases to be a will. It can not be ambulatory in part. It can not be both bond and free. Every provision contained in a will, including revoking clauses, must partake of the ambulatory character of the instrument; hence it is an unsuitable and improper vehicle for the conveyance of "a verbal act done solemnly and deliberately for present effect." See *Scott* v. *Fink*, 45 Mich. 246.

If, therefore, a testator chooses to insert a revoking clause in a will it can not take effect in his lifetime, no matter what his intentions may be. The statute gives him the choice of several ways of revocation, and he is bound by his selection. After he has made his will the statute upholds the same until revoked in the statutory manner. It has sufficient vitality to exist without further assistance. An unrevoked will needs no revival. Any number of unrevoked wills of a testator may exist at the same time without detriment during his lifetime, and without raising any question of revival. After the death of the testator the question of *survival* of a will would immediately arise. The misuse of the word "revival" concerning wills is responsible for much of the misunderstanding on the

subject. We are aware that the decisions are discordant, but the better reasoned cases are in line with these views upon the subject.

The question is well stated by Burks, J., in *Rudisill's Ex'or.* v. *Rodes,* 29 Gratt. 147 (1877):

"Previous to the act I Vic. ch. 26, it was a vexed question in the English courts, whether by the destruction, *animo revocandi,* of a will containing a revocatory clause, a former will preserved uncancelled, was thereby revived.

"It seems to have been held generally by the common law courts, that in such a case it was a necessary conclusion of law, admitting of no proof to the contrary, that the former will was revived. This rule was deduced from the nature of the revoking instrument, which is itself revocable and never becomes final and absolute until the death of the testator; and it was considered that the effectual revocation of such instrument, restored the former will and left it to operate in like manner and with like effect as if the revoking will had never been executed. *Goodright* v. *Glazier,* 4 Burr. R. 2512; *Burtenshaw* v. *Gilbert,* 1 Cowp. R. 49; *Bates* v. *Holman,* 3 H. & M. 503, 525, 542; I Jarman on Wills, 123; 4 *Kent's Com'rs.,* 531; I Redfield on Wills, 374, 375; *Tuck Bl. Comm.* (Book 2) 294; 2 *Minor's Ins.* 931, 932.

"On the other hand, in the ecclesiastical courts, the revival or restoration of the former will was made to depend on the intention of the testator, to be gathered from the facts and circumstances of each particular case, and parol evidence was admissible to show the intention. I Jarman on Wills, *supra,* and cases cited in notes on *Lawson* v. *Morrison,* 2 Amer. Lead Cas. (5th ed), 482, 518 to 523.

"The effect of the rule in the law courts was to exclude arbitrarily all extrinsic evidence of intention upon the question of revival, and thus oftentimes to set up a will contrary to the intention of the testator; while the rule in the ecclesiastical courts threw the door wide open to the admission of such evidence, and suffered the intention of the testator to be determined by 'the uncertain testimony of slippery memory.'"

The following extracts from some of the leading cases ex-

hibit the line of argument adopted in support of the common-law rule:

In *Goodright* v. *Glazier* (1770), *supra*, Lord Mansfield said: "Here, the intention of the testator is plain and clear. A will is ambulatory till the death of the testator. If the testator lets it stand till he dies, it is his will; if he does not suffer it to do so, it is *not* his will. Here, he had two. He has cancelled the second; it has no effect, no operation; it is as no will at all, being cancelled before his death. But the former, which was never cancelled, stands as his will."

In the same case Mr. Justice Yates concurred with Lord Mansfield, and said: "A will has no operation, till the death of the testator. This second will never operated; it was only intentional. The testator changed his intention; and cancelled it. If by making the second, the testator intended to revoke the former, yet that revocation was itself revocable; and he has revoked it."

In *Harwood* v. *Goodright*, 1 Cowp. 92 (1774), Lord Mansfield, in delivering the opinion of the court, says: "If a testator makes one will and does not destroy it, though he makes another at any time virtually or expressly revoking the former; if he afterwards destroy the revocation, the first will is still in force and good." And this case was, on appeal to the House of Lords, affirmed.

The common-law rule was followed in *Lawson* v. *Morrison*, 2 Dallas, 286 (1792): "Here is a good *subsisting* Will properly attested: There is no way to defeat it, but by proving it was revoked by another Will, *subsisting* at the death of the Testatrix, or that she cancelled the latter Will, so revoking all former ones, with a mind to die intestate."

*Pringle* v. *McPherson*, 2 Brevard *279 (1809): "Whenever the intention to devise has been expressed with requisite formalities, while suffered *to exist*, it remains unimpeachable, except by evidence of equal authority, and subsequent in date."

In *Taylor* v. *Taylor*, 2 Nott & McCord, 663 (1820), Huger, J. said: "As a will is ambulatory, and can have no effect until the death of the testator, it would seem to follow, that the

testamentary paper, permitted by a testator to survive him, must be his will; until consummated by death, it is inoperative and ineffectual, and has no legal existence.

"A testamentary paper, duly executed, and which is permitted to acquire a legal existence by the testator, will not be destroyed by a paper which does not exist, and whose legal or operative existence was prevented by the voluntary act of the testator himself.

"If two consistent (co-existent) wills be left by a testator, as they have both been consummated by his death, a question would arise as to their validity; which is the last will, must be decided; and here the dates are very important. But when only one testamentary paper survives, there can be no such question. . . .

"By the common law the first will is presumed to be restored to its active energy by the cancelling of the second. By the civil law the first is regarded as annihilated by the second; and it requires other evidence than a destruction of the second to revive the first. In both it is regarded as a question of intention, and may be controlled by other evidence.

"I am best satisfied with the common law rule, and if I were not, I should not feel myself at liberty to violate the Act of the Legislature, which has made of force in this State the common law."

*Marsh* v. *Marsh*, 48 N. C. 77 (1855). Pearson, J.: "As wills are ambulatory, and have no operation until the death of the testator, it is difficult to see how the execution of a second will, which is afterwards destroyed by the testator, can, in anywise, affect the validity of a will previously executed. Both are inactive during the life of the testator, and the cancellation of the second, it would seem, must necessarily leave the first to go into operation at the testator's death. Nor is it perceived how the fact, that the second contained a clause of revocation, can alter the case; because that clause is just as inactive and inoperative as the rest of it, and so continues up to the time that the whole is cancelled. This principle is settled in the common law courts in England, in regard to devises. *Good-*

*right* v. *Glazier*, 4 Burr. 2512; *Harwood* v. *Goodright*, Cowper 92,
I Jarman 123."

*Randall* v. *Beatty*, 31 N. J. Eq. 643 (1879): "The true rule
on the subject is, that where one will is revoked by another,
the revocation is testamentary, and the revocation of the latter
will revives the former."

*In re Gould's Will*, 72 Vt. 316 (1900). Tyler, J.: "The
weight of authority in this country is clearly in support of the
rule that a republication is not necessary to revive a will that
has been revoked by a subsequent one that has itself been
revoked, even though the subsequent will revokes the prior
one in express terms; that the prior will is not annulled by such
revocation, for the reason that such revocation does not take
effect until the will itself which contains the revocation becomes
operative by the death of the testator; that until that event
the revocation is ambulatory; that by the second will the tes-
tator merely declares his intention to revoke the first; that he
may change his intention at any time; that if, after his death,
it appears that the revoking will has itself been destroyed, then
the intention to revoke never goes into effect." See also
*Peck's Appeal from Probate*, 50 Conn. 562, 566.

In *Flintham* v. *Bradford*, 10 Pa. St. 90, the Supreme Court
of Pennsylvania say: "All wills are in their nature inchoate
and ambulatory until testator's death, at which time, and not
before, the testament becomes operative and complete. The
will of 1824 was an inchoate intention, mutable and inconstant,
and, by the wilful and deliberate act of cancellation on the part
of the testator, it became as if it never had been. The prior
will of 1821, being preserved by the testator entire, and without
intentional or apparent blemish, became *the* will for the time
being, which would be consummated at the testator's death,
unless before that time he manifested a change of intention,
according to the rules of law." See also *Barksdale* v. *Barks-
dale*, 12 Leigh. 535 (1842). Furthermore, it is held that:
"A subsequent will containing a clause revoking an earlier
will must, as a general rule, be admitted to probate before the
clause of revocation can have any effect, and the same kind,
quality, and method of proof is required for the establishment

of the subsequent will as was required for the establishment of the former will. An exception exists, however, where the subsequent will has been lost or unintentionally. destroyed." Am. & Eng. Ency. Vol. 30, p. 625 c. c. c., and cases cited; *Reid* v. *Borland*, 14 Mass. 208; *Laughton* v. *Atkins*, 1 Pick. 535; *Wallis* v. *Wallis*, 114 Mass. 510; *Stickney* v. *Hammond*, 138 Mass. 116; *Sewall* v. *Robbins*, 139 Mass. 164.

On the contrary, as stated by Chief Justice Magruder, in *Stetson* v. *Stetson*, 200 Ill. 601 (1903): "There are cases, which hold, and many of the text books endorse and sustain the holdings of such cases, that, where a person, having made a will, afterwards makes another will, containing a clause expressly revoking all former wills, and afterwards destroys the second will, and dies, leaving the former will uncanceled, the revoking clause operates instantaneously to effect a revocation, and that, consequently, the destruction of the second will does not revive the former one. (1 Underhill on Wills, sec. 266; Schouler on Wills, secs. 412–418; *James* v. *Marvin*, 3 Conn. 577; *Scott* v. *Fink*, 45 Mich. 241; *Cheever* v. *North*, 106 id. 390; *Hawes* v. *Nicholas*, 72 Tex. 481; *Pickens* v. *Davis*, 134 Mass. 252; *Barksdale* v. *Hopkins*, 23 Ga. 332)."

The case of *James* v. *Marvin* (1821), *supra,* is the foundation of the foregoing doctrine in this country and is based upon a misconception of the law. The opening statement of the opinion of Hosmer, Ch. J., raises a false issue: "If the will of Peter James, made in May, 1819, were in existence, the clause of express revocation, would, undoubtedly, revoke the prior will, now in question. The only enquiry before the court, is, whether the destruction of the latter will containing the revoking clause, has revived the former."

The question of revival can never arise until after the determination of the question of revocation. In other words, an unrevoked will needs no revival. And revocation of certain kinds would effectually prevent revival, viz.: complete destruction by burning, or otherwise.

The first question before the court, therefore, was, did the later will revoke the former; not, merely, did it contain a clause of revocation? To assume that the latter will did revoke the

former was to beg the very question in issue.  The question of
revival was not involved.  Having obscured the issue, the court
proceeded to misstate the law, as follows: "An express
revocation, is a positive act of the party, which operates, by
its own proper force, without being at all dependent on the
consummation of the will in which it is found, and absolutely
annuls all precedent devises.  This principle was settled in
*Burtenshaw* v. *Gilbert*, Cowp. 49."

In that case the testator, having executed his will and a
duplicate, delivered the duplicate to another person; after-
wards he executed another will and at the same time tore off
his name and seal from the old will and caused the names of
the witnesses to the old will to be cut off.  Lord Mansfield
did not speak of the intention of revocation, contained in the
will, as a positive act of the party.  He did refer to an act,
but it was in these words (p. 52): "With respect to the *revoca-
tion* of a will by the act of *cancelling*, it is in itself an equivocal
act; and in order to make it a revocation, it must be shown
*quo animo* it was cancelled.  For, unless that appears, it will
be no revocation."  After illustrating his argument, he pro-
ceeds: "But see how strong a case the present is, as to the
testator's *intention* to revoke.  At the very time of making
his first will, he expresses his dissatisfaction at it; and adds,
that he meant to alter it if he should survive his wife, because
Mrs. Weston would take more under it than he intended she
should do.  He persists in the same intention after the death
of his wife, and executes it by a new will in 1761, which is a
complete, legal, and effectual will; and if he had died im-
mediately after, whether he had cancelled the former, or not,
it would have been revoked; because at the end of the second
will, there is a declaration by which he revokes all former wills.
Besides this, he deliberately cancels that part of the will of
1759 which he had in his own possession; and by the evidence
it is clear, that he had not the duplicate in his possession at
that time; for he mentions that it was in the hands of Mrs.
Weston; and the reason appears, why he could not well get
at it, from the circumstance that induced him to give Mr.
Sampson the care of the second will: namely, that if Ann

Newenden or Mrs. Weston should get at it they might destroy it.

"The facts are too many and too strong to admit of a question, but that, at the time of making the second will, the first was upon every principle of law clearly revoked, and can never be set up again but by a new will." In this opinion Justice Aston concurred as follows: "If the duplicate of the will of 1759 had still remained in the hands of the person to whose custody it was originally entrusted, yet the cancelling that part which the testator had in his own possession would have been a sufficient cancelling of such duplicate."

It is perfectly apparent that the act of cancellation was the act referred to by Lord Mansfield and that the clause of revocation in the second will was used by him merely as evidence of the intention with which the cancellation was effected. That Lord Mansfield had no intention of laying down the principle claimed by Justice Merwin is perfectly apparent from his remarks, hereinbefore quoted, in *Harwood* v. *Goodright, Ibid,* 87, at p. 92 (which was decided less than two months later, in the same year (1774) as *Burtenshaw* v. *Gilbert*). "In this case there is no dispute as to the testator's power to devise: therefore a revocation must be shown, and the mode of doing that is by another will. But that is not all; for he must shew in fact, that it was *revoked* by another will which *subsisted* at *the death* of the testator; because if a testator makes one will and does not destroy it, though he makes another at any time virtually or expressly revoking the former; if he afterwards destroy the revocation, the first will is still in force and good."

*Pickens* v. *Davis*, 134 Mass. 252, decided February 3, 1883, places reliance upon *James* v. *Marvin, supra,* which in *Peck's Appeal from Probate*, 50 Conn. 562, January Term, 1883, is explained as follows: "The Statute (1821 'no devise of real estate shall be revoked otherwise than by burning,   .   .   . or by some other will or codicil in writing, declaring the same, signed by the testator in the presence of three or more witnesses, and by them attested in his presence,') comes before us now for the first time for a construction."   .   .   .

"And it must be remembered that the statute changes the aspect of the first question. It is not now what it was when

*James* v. *Marvin* was decided. There any written declaration to that effect revoked a will irrespective of any statute and without regard to the death of the testator. Now the statute requires that the writing, in order to have that effect, must itself be a will or codicil, and executed with all the formalities required for such instruments. Under the Statute it may be claimed, and the claim sustained by very respectable authorities, and supported by reasoning of considerable force, that the will, even though it contain a clause expressly revoking former wills, must take effect as a will before the revoking clause will be operative. . . .

" The law as laid down by Hosmer, C. J., relating to the effect of a revoking clause in a subsequent will, is questioned by an eminent writer on the law of wills, I Redfield on Wills, 328. After referring to the Connecticut case, he says: ' This doctrine has an air of plausibility, from the fact that an instrument of revocation alone would unquestionably have this effect. But that would show a present purpose of becoming. intestate, carried into effect as far as practicable before death. But the making of a will, with a revocatory clause, is made dependent, in some sense, upon the subsequent will going into operation. And there is ordinarily no purpose of having the revocatory clause operate except upon that condition. The whole instrument is, therefore, ambulatory, and when destroyed it all ceases to have any operation. And such seems to be the doctrine of *Laughton* v. *Atkins*, 1 Pick. 535; *Reid* v. *Borland*, 14 Mass. 208; *Limbery* v. *Mason & Hyde, Comyns*. 451; *Hyde* v. *Hyde*, 3 Chan. Rep. 155; and *Onions* v. *Tyrer*, 2 Vern. 742. . . .

" The weight of authority seems to be in harmony with the views expressed by Mr. Redfield. . . . We are decidedly of the opinion that if we hold that the execution of the second will operated to revoke the first, we shall go counter to the prevailing current of authority, and produce a greater discordance between our own law and the laws of other jurisdictions than now exists; a result certainly which it is desirable to avoid.

" We also think that to be the most reasonable view. The

testatrix by executing the second will evinced no intention to become intestate, but rather a contrary intention. By destroying the last will and carefully preserving the first she affords satisfactory evidence that she intended until the very last to die testate, and that that should be her will. In the absence of an express provision to that effect we can not presume that the legislature intended that the mere execution of a will should in all cases revoke a prior will. Such a construction would in many cases defeat the manifest intention of the testator. The Statute requires a 'later will or codicil.' We think that means an operative will or codicil."

In *Scott* v. *Fink*, 45 Mich. 241, the court falls into the same error as did the learned chief justice in *James* v. *Marvin*, saying of the opinion of Lord Mansfield: "The court takes notice, it is true, of the act of mutilation of the one part of the old will, but the circumstance on which stress is laid is the existence of revocable words in the new will, and there is strong ground for inferring that the result would have been just the same if the act of spoliation of the one part of the old will had not been committed." The court then continues:

"There seems to have been a material distinction, and on good ground, between the state of a former will after a second one merely inconsistent with it, and its state after a second one with a declaration expressly revoking it.

"In the first case the only chance for the second to operate in revocation of the first, according to the prevalent theories of the courts, was by its coming to a head as an active will, which it could do only by surviving its author. Being the last expression of the decedent and at the same time practically inconsistent with the prior one, the intent to repeal the first by it was to be implied. In case, however, of its being recalled by the testator in his lifetime, it could not, on the theory referred to, be taken to have had the effect to do away with its predecessor. Being cut off before having its dispositions of property awakened into life, it could have no affirmative operation through its dispositions upon the estate.

"In the second case the written declaration is express and in plain terms immediate and absolute. It is a verbal act

done solemnly and deliberately for present effect, and not an act contemplating that future circumstances are to determine whether after all it shall have any force. It is not a needful ingredient of the will. That is perfect without it. The addition of it is a mode of immediate cancellation of prior wills, and quite as unequivocal and unambiguous as many others within the statute whose meaning is open to no controversy. It operates at once, and does not apply as a mere contingent caveat against the objects at which it is aimed. It revokes them without reserve or qualification. And in case the document with which it is connected is itself revoked, that fact can have no effect as a restoration and republication of former revoked wills.

"It is only necessary to glance at the authorities to see that judicial opinion, as already suggested, is not harmonious in regard to this question. Much, no doubt, of the diversity may be traced to variety of legislation, but not all. Upon consideration, the doctrine of *James* v. *Marvin*, 3 Conn. 576; *Boudinot* v. *Bradford*, 2 Dall. 266, and others holding the same views and ruling in accordance with what has just been expressed, appears to be most consonant with our system and with popular understanding, and at the same time the most reasonable and safe."

The above argument is singularly incomplete. To say of a revocatory clause that "it is not a needful ingredient of the will. That is perfect without it," is inconclusive; for it leaves another vital question still unanswered: Is the clause also independent of the will and perfect without it? For if it is not it is clearly testamentary. It is not; its very life depends upon the will, as may easily be demonstrated: Cut the revocatory part out of a will and what is it? A piece of parchment or paper containing an undated, unsigned, unsealed, unwitnessed, unidentified and unprovable clause of revocation. Within the will, if unnecessary, it is a mere matter of form; without the will it is absolutely worthless. It can not be proved except as a part of the will; and therefore can not be proved until the will can be proved. If such a clause is unnecessary and superfluous in a will, it may be rejected as

surplusage. A perfect will is a complete will, and the gilding of refined gold ought not to be encouraged by serious tribunals. But when learned courts, instead of rejecting the same, decide that the superfluous portion must be allowed to operate *at once*, and *irrevocably*, they announce a doctrine involving the very absurdity pointed out by the counsel for the appellees in *James* v. *Marvin, supra:* "That after the deliberate destruction of a will, by the person who made it, there would still remain one clause of it *in full force*, a position no less repugnant to decided cases, than to principle and common sense."

Courts that permit the revocatory clause in a will to take effect irrevocably and at once upon execution of the will are driven to explain the difference between wills with and without such a clause. In *James* v. *Marvin, supra*, the latter is termed "*a will* merely." The former might be termed a *more* will. The difference between a *mere* will and a *more* will, containing an unnecessary ingredient, would seem to be the difference between perfection and superfluity. The following would seem to be correct definitions of the same: A *mere* will is one which takes effect upon the death of the testator, and is ambulatory during his lifetime. A *more* will is a composite and super-serviceable instrument which becomes fixed, stationary, and irrevocable in its clause of revocation, while the remainder is ambulatory. Efforts to combine irresistible force with complete immobility, in our opinion, are likely to find a resting place with other notable failures such as the attempts to discover perpetual motion, the philosophers' stone, and the fountain of youth. To our minds it seems illogical to argue that a will is ambulatory in part; the position that the revoking portion of a will is fixed and stationary while the remainder is ambulatory seems inconsistent and paradoxical. The explanation that the revoking clause, although contained in a will, forms no part of it does not tend to clarify the situation. An instrument is a will or it is not. All wills are mere wills; for, as has already been shown, it has been decided that a mere will is a perfect will. And we can not conceive of such a thing as perfection plus. All parts of wills must therefore remain ambulatory during the lifetime of the testator.

In this connection the following remarks of Sharswood, J., in *Rudy* v. *Ulrich*, 69 Penn. (1871) p. 182, are illuminating: "The Act of Assembly of April 8th 1833, §§ 13, 14 Pamph. L. 250, provides in effect that no will in writing shall be repealed otherwise than by some other will or codicil in writing, or by other writing declaring such repeal, executed and proved in the same manner as is provided in the case of an original will. There are two modes of revocation here pointed out, besides cancellation, obliteration, &c. First: another subsequent will or codicil duly executed and proved; and second, some other writing declaring the revocation. It is implied that this other writing is not a will, that is, an act of disposition or declaration of what a man intends as to his property after his death. There may be a separate written revocation, not intended to take effect as a will or codicil, which need not, therefore, be propounded to the register for probate. This is a very reasonable provision. A man may be absent from home at a distance from the place where his will is deposited, or it may be lost or mislaid, so that he can not have access to it to cancel or destroy it. He may wish, however, simply to abrogate it without making another will, and so die intestate. In such case he may execute a paper declaring his intention, which provided it is signed by him and proved by two witnesses will be effectual. No probate of it in the register's office is necessary. No letters testamentary or of administration *cum testamento annexo* are required to be issued upon it. But the case is different when the revocation is contained in what purports to be a will disposing of property. The words of the act point to this: "other writing," that is, writing other than a will. A subsequent will without a revoking clause as effectually repeals a prior will as with one."

*Scott* v. *Fink, supra,* was mildly supported in *Cheever* v. *North,* 106 Mich. (1895) 390, 395, Montgomery, J., in these words: "And after holding that a will containing a clause of revocation does operate to revoke a former instantaneously, and of its own force, the court concludes by saying: 'Upon consideration, the doctrine of *James* v. *Marvin,* 3 Conn. 576; *Boudinot* v. *Bradford,* 2 Dall. 266; and others holding the same

views, and ruling in accordance with what has just been expressed, appears to be most consonant with our system and with popular understanding, and at the same time the most reasonable and safe.'

"While it may be said that this language was not absolutely necessary to a determination of the case, yet it is evident that a conclusion was reached and the announcement made after careful deliberation; and we feel that we ought not to disturb the rule laid down, without being convinced of its error upon authority."

*Boudinot* v. *Bradford, supra,* contains, among others, these two propositions, laid down without argument or citation of authority, and apparently in a charge to the jury, by M'Kean Ch. J.: "1st. Where a second Will is made, containing an express clause of revocation, the preceding Will, though not formally cancelled, is revoked.

"2d. Where a second Will is destroyed, *without more,* the preceding Will, not having been cancelled, is, generally speaking, *ipso facto* revived."

In the case of *Lively* v. *Harwell,* 29 Ga. 509 (1859), Stephens, J., argues as follows: "It has been a long mooted question whether the single fact of the revocation of a subsequent will, revives a prior revoked one. The argument in favor of the revival is this: The first will would be good but for the last which revokes it, and this last being itself afterwards revoked, becomes a *nullity*—has no effect whatever, and of course leaves the prior will unaffected. And it is analogized to the case of a statute revived by the repeal of another which had repealed the first. Such is the rule of the common law in the case of *statutes,* but the civil law is different, and so is the good reason of the thing different. Where a principle is *sound,* it ought to be carried to all strictly analogous cases, unless stringent authority forbids; but if the principle be *unsound,* analogy ought not to be allowed to carry it to a single case beyond the imperative demands of authority—the cases in which it has been already planted by decisions. Then is it a sound *logical* principle that a statute is revived by killing the statute which had previously killed the first? Is a dead man revived by

killing his slayer? Is not the result rather this: whereas you had at first one dead man, now you have two?"

The argument is fallacious because the premises are incorrect. The fallacy consists in assuming that the first will was revoked by the second.

"This Court is founded in holding, under the sanction of the superior Court, that the legal presumption is neither adverse to, nor in favor of, the revival of a former uncancelled, upon the cancellation of a latter, revocatory, will. Having furnished this principle, the law withdraws altogether; and leaves the question, as one of intention purely, and open to a decision, either way, *solely* according to facts and circumstances. This, I conceive, is the true principle to be extracted from the judgment of the Court of Delegates in the case of *Moore* v. *Moore and Metcalf*, a case determined, after an able argument, upon the fullest consideration." *Usticke* v. *Bawden*, 2 Addams, 116 (1824).

"A clause in a subsequent will, which in terms revokes a previous will, is not only an expression of the purpose to revoke the previous will, but an actual consummation of it, and the revocation is complete and conclusive, without regard to the testamentary provisions of the will containing it." *Colvin* v. *Warford*, 20 Md. 357 (1863). The case is evidently founded on *James* v. *Marvin, supra,* for it makes the same mistake as is made in that case concerning *Burtenshaw* v. *Gilbert, supra,* and cites them both.

"A man has the *power*, then, to insert in his will a revocation that shall be operative, though it turn out, that the will itself shall be inoperative. Having the power, a man may, if he *pleases*, insert in his will a revocation that shall be operative independently of the will." *Barksdale* v. *Hopkins*, 23 Ga. 332 (1857).

*Lane* v. *Hill*, 68 N. H. 275 (1895) holds that the destruction of a second will containing a clause of revocation does not revive the first, and relies for authority upon *Pickens* v. *Davis*, 134 Mass. 252, and *Cheever* v. *North*, 106 Mich. 390, which rest on *James* v. *Marvin* and *Scott* v. *Fink, supra.*

"A written declaration properly executed as effectually

revokes a will from the date of its execution as does its destruction. If the purpose to revoke is sufficiently expressed and the writing is properly executed it can not be controlled or limited by the name given the instrument, or by its containing other provisions." *Hawes* v. *Nicholas,* 72 Tex. 481 (1889). This decision relies upon *James* v. *Marvin* and *Peck's Appeal, supra.*

*In re Cunningham,* 38 Minn. 169 (1888), decides that a later will, properly executed as such, and containing a clause revoking former wills, is effectual as a revocation, although, having been lost or destroyed, its contents (other than the revocatory clause) can not be proved so that it can be allowed and executed as a will. This decision depends in part upon *James* v. *Marvin supra.*

*Stevens* v. *Hope,* 52 Mich. 65 (1883): "We think the charge was misleading. . . . Certain requests were accepted as accurate statements of the law, and we find among them the statement that the revoking will, whether destroyed or not, would do away with the prior one. But the point was not allowed to rest on these requests. The judge took up the matter in his original observations, and laid it down expressly, that the second will would only operate to revoke the prior one in case it remained in force at the testator's death. In this respect the direct instruction was an absolute contradiction of the statements read from the requests, and was, moreover, . . . an erroneous explanation of the law." The decision depends in part on *Wallis* v. *Wallis,* 114 Mass. 510 (1874), which was decided "in accordance with the practice established in the English Ecclesiastical courts before the Declaration of Independence, and adopted by the courts exercising similar jurisdiction in New York and New Jersey."

Our examination convinces us of the superiority of the common-law rule. Therefore, upon full consideration, it appears to our satisfaction that the better reasoning and weight of authority favor the position that the third will of the testator was not revoked by his fourth will containing a clause revoking all prior wills, which was itself purposely destroyed by the testator; and that oral testimony of the

contents of the fourth will was improperly admitted. To permit the revocation of a will to be accomplished through oral testimony concerning the contents of a later will which has been intentionally destroyed by the testator is to open the door closed by the statute, and to invite the entrance of the very mischiefs for the exclusion of which the statute was enacted.

The former opinion in this case is therefore affirmed.

*James L. Jenks and Gardner, Pirce & Thornley,* for appellant. *William W. Moss,* of counsel.

*John N. Butman and Bassett & Raymond,* for appellee.