J. R. Dougherty et al. v. Lillie Holscheider et al.

Decided June 7, 1905.

**1.—Wills—Holographic Will.**

Letters wholly in the testator's handwriting, signed by him, and directing a disposition of his property in case of his death, may constitute a holographic will, valid under the statute, though not attested by witnesses. (Rev. Stats., arts. 5335, 5336.)

**2.—Same—Conditional Will—Revocation.**

Where the testator stated in such letters that he was about to undergo a surgical operation, in which there might be danger, though he did not anticipate such, and, if anything happened to him, he desired his property disposed of as therein stated, the will was a conditional one, and the contingency not having arisen, the testator living for about two years after the operation, the will thereby ceased of effect and was annulled.

**3.—Same—Unconditional Will.**

Where the happening of an event is merely referred to as giving the reason for the making of the will, it is an unconditional one, but it is otherwise where the testator intended to dispose of his property only in the case of the happening of the event named.

**4.—Same—Conditional Will Revoking Former One.**

The conditional holographic will, since it made a disposition of the property entirely inconsistent with a former will, operated to revoke such former will, and this although the conditional will, because of the failure of the contingency to arise, itself ceased to be effectual and became no will. It was, nevertheless, a "declaration in writing," sufficient, under the statute, to revoke the former will, which could then be given vitality only by a republication. (Rev. Stats., art. 5337.)

Appeal from the District Court of Duval. Tried below before Hon. Stanley Welch.

*Dougherty & Dougherty, J. O. Luby* and *J. C. Scott,* for appellants.

*D. McNeill Turner,* for appellees.

FLY, ASSOCIATE JUSTICE.—On July 20, 1904, Lillie Holscheider applied to the County Court of Duval County for the probate of a will executed by Raf Welder, on February 21, 1900, in which he bequeathed to his two children, Mary and Duncan, the sum of ten dollars, to his sister, Mary O'Connor, his entire interest in his father's estate, and to Lillie Holscheider, then Lillie Ramey, all the balance of his property, consisting of over twenty thousand acres of land and personal property. Lon C. Hill and B. W. Klipstein were the independent executors named in the will. On July 21, 1904, Mrs. Mary O'Connor and James R. Dougherty applied for the probate of a will alleged to have been executed by Raf Welder, who died on February 7, 1904, and of which James R. Dougherty had been appointed executor. That will consisted of two letters written by Raf Welder to Dougherty, which are as follows:

"Hebronville, April 4, 1902.

Mr. J. R. Dougherty,
　　Beeville,

Dear Sir and Friend:—Yours of yesterday to hand, and in reply, will say, that I have instructed Mr. John Corrigan to pay you over the money in case you made a settlement. He left here Thursday last for home, and I presume will see you. If he does not show up there, you either send for him or draw a check on him through the bank, or you can drop him a note through the post office, I will write him myself.

Friend Jim:—I am going to start to Monterey tomorrow, to have a surgical operation performed on me, and possibly I may never get back alive. I will write you full particulars as to what to do with my stuff when I get there, the doctors have said that it would not be dangerous, but in case anything should happen I want you to see to what I have left; as I said to you before I am not satisfied with the way things are going; will also instruct him to pay you balance of your fee, he has just sent me $400. This, with what he pays over to you is all I have received from him; he has never paid any interest on the note whatever, so thanking you for your kindness in this matter and hoping to see you again some of these bright days, I will say goodbye.

　　　　　Your friend,　　　　　Raf Welder."

Monterey, Mexico, May 6, 1902.

Mr. James R. Dougherty,
  Beeville, Texas.
  Friend Jim:—I wrote you some weeks ago, and told you that I intended undergoing an operation, and that before doing so, that I would write you and tell you what to do with my stuff, in case anything happened to me. I expect to be operated on tomorrow. First, I owe the First National Bank of Beeville, $154.30 due in July, that I want paid. Second, John Corrigan in July will owe me two years' interest on that note, less $822; he is also to pay me interest on the amount that was due last July. I want you to attend to it all for me, as though it was your own. Third, I want you to finish educating those two girls of Mrs. Rameys that I have raised, Nellie and Susie, and after they have been given a thorough education, the remainder, I want it to go to my sister, Mrs. Mary O'Connor, at the same time I want you to compensate yourself for your trouble. You will have to be careful with Mr. Corrigan as he is liable to become involved; he owes a great deal of money while he has enough property to pay out of any ordinary trouble, but you will have to hold the reins over him. Now, Jim, possibly this is asking too much of you, but as I have known you from boyhood up and your father before you, I have all confidence in your carrying out my wishes, while I don't anticipate any danger, as the doctor has assured me that there is no danger, yet there might be, and I think this will fully explain to you my wishes. You can write me here on receipt of this. I will close hoping to hear from you soon and with best wishes to all inquiring friends, I remain as ever,
  Your friend,        Raf Welder.

  P. S. You can address your letters to 66 San Francisco Street, Monterey, N. L., Mexico, also tell Brother Klipstein that I have instructed you to settle that little matter at the bank and not to be uneasy.
  Raf."

  On August 17, 1904, Mrs. O'Connor filed a contest to the application of Mrs. Holscheider to probate the first will of Welder, and by an order of the County Court the application for probate of the two wills were consolidated. The contest of the will was made on the ground of undue influence on the part of Mrs. Holscheider, and on the ground that it had been revoked by the transfer of the lands by Welder after the will was executed and by the execution of a holographic will entirely inconsistent with the terms of the first will.
  Duncan Welder and Mary Welder, minor children of Raf Welder, through their mother Mrs. Julia D. Welder, filed a protest against the probate of both wills, against the first on the ground of undue influence and against the second on the ground that it was dependent on a contingency which did not arise. They stated, however, that if the first will was held not to have been the product of undue influence, they withdrew all objections to the probate of the second will. The second will was admitted to probate by the County Court, and an appeal was taken to the District Court where the first will was probated.

It was proved that the letters, hereinbefore copied, were in the handwriting of Raf Welder and were signed by him and were duly received by James R. Dougherty, who had them in his custody from the time of their reception until they were filed in the County Court. Raf Welder lived about two years after he wrote the letters.

The requisites of a written will, prescribed by article 5335, Sayles' Civil Statutes, are, that it must be signed by the testator, or some other person by his direction, and if not wholly written by himself, must be attested by two or more credible witnesses above the age of fourteen years, subscribing their names thereto in the presence of the testator. Where the will is wholly written by the testator the attestation of the subscribing witnesses may be dispensed with. Article 5336.

The letters written by Raf Welder to J. R. Dougherty have the essentials necessary to constitute a will under the statute, and unless the will was to take effect only upon the fatal termination of the operation referred to therein, it should have been probated by the District Court.

A will which is to become effective only upon the happening of a contingency, is a contingent will, and in case the contingency does not arise, is by the failure of the happening of the event annulled and revoked. There are numerous cases, English and American, involving the construction of wills in which contingencies were expressed, for it seems to be very common for those unlearned in the law who wrote their own wills to do so under the influence of the fear or expectation of imminent peril and consequent death, but an infallible guide for their construction is difficult to be evolved therefrom. The current of modern authority, however, seems to be that if the happening of the event is merely referred to as giving the reason or inducement for the making of the will it be held unconditional, but if it appears that the testator intended to dispose of his property in case of the happening of the named event, then it will be held to be conditional. The rule is thus stated in the case of French v. French, 14 W. Va., 459.: "It seems that it is now an established principle that, while a person may make a conditional will, his intention to do so must appear clearly. The question is, whether the contingency is referred to as the reason or occasion for making the disposition, or as the condition upon which the disposition is to become operative." In that case the words used by the testator were: "Let all men know hereby that if I get drowned this morning, March 7, 1872, I bequeath all my property, personal and real, to my beloved wife, Florence." He was about to go on a journey and had to cross a swollen stream. He was not drowned, but lived for three years thereafter. The court held that the will was not conditional.

In the case of Eaton v. Brown, decided by the Court of Appeals of the District of Columbia, and reported in the Central Law Journal, Vol. 56, No. 9, the testatrix used the following words: "I am going on a journey and may not ever return. And if I do not, this is my last request." It was held that the will was a conditional one, and as the maker of it did return, it was not effective. The following cases are cited as sustaining the decision: Parsons v. Lanoe, 1 Ves. Sr., 190; Sinclair v. Hone, 6 Ves. Jr.; 607; In re Winn., 2 Perry & Davison, 47; in re Roberts 8 Jur. (N. S.), 220; In re John Porter, L. R., 2

Perry & Davison, 22; In re Robinson, L. R., 2 Perry & Davison, 171; Lindsay v. Lindsay, L. R., 2 Perry & Davison, 449; In re Ward, 4 Haggard, 176; In re Todd, 2 Watts & Serg. (Pa.), 145; Morrow's Appeal, 116 Pa., 440; Wagner v. McDonald, 2 Harris & J., 345; Maxwell v. Maxwell, 3 Metc. (Ky.), 101; Dougherty v. Dougherty, 4 Metc. (Ky.), 25; Robnett v. Asjlock, 49 Mo., 171; Magee v. McNeill, 41 Miss., 17.

In most of the cases holding wills dependent on the happening of the condition named, the words, "if I never get back," referring to a certain journey, or "should anything happen to me," referring to a particular time or event, were used. In this case the words were: "Friend Jim, I am going to start to Monterey tomorrow, to have a surgical operation performed on me, and possibly I may never get back alive. I will write you full particulars as to what to do with my stuff when I get there. The doctors have said that it would not be dangerous, but in case anything should happen I want you to see to what I have left." That was the language of the first letter, and in the second, in which disposition is made of his property, he said: "I wrote you some weeks ago, and told you that I intended undergoing an operation and that before doing so that I would write you and tell you what to do with my stuff, in case anything happened to me. I expect to be operated on tomorrow." After expressing his desires as to the disposition of his property he again said: "While I don't anticipate any danger, as the doctor has assured me that there is no danger, yet there might be, and I think this will fully explain to you my wishes." We think the words of the letter indicate clearly that it was written merely as an expedient in case of death resulting from the operation. In both letters he desires certain things done "in case anything happened," evidently in connection with the operation. The words bring it clearly within the purview of cases holding that the wills were contingent on the happening of certain events. Morrow's Appeal, 9 Atl. Rep., 660, in which the authorities are cited.

Although the second will, as evidenced by the letters, afterwards became of no effect because of the failure of the happening of the contingency on which it was based, it was a valid will, which was utterly inconsistent in the disposition it made of the property, with the disposition of the property made in the first will. It evidenced in no uncertain way that it was the desire of the testator to revoke the former will, and if it was a compliance with the terms of the statute in regard to the revocation of wills, it destroyed the first will the moment it was published, regardless of its being afterwards annulled. No matter what may have been the intention of the testator as to his will being contingent on the result of the surgical operation, the desire to revoke his former will was evident, and that desire could not have been dependent on the result of the operation. He may have concluded that if he recovered from the operation that he could carry into execution the disposition of his property in the way he indicated in his letters; but he had annulled his former will, and nothing but a republication of it could give it validity again. It is true that in common law courts of England the earliest will which had been revoked, but never actually destroyed, was presumed to have been revived by the destruction or revocation of

the revoking will, even though it had never been republished, and a distinction has been made in some cases between the revival of a will revoked by the inconsistent disposition of the property, contained in a subsequently executed will, and a will revoked by an express revocation clause in a subsequent will. Calvin v. Medford, 20 Md., 35; Cheever v. North (Mich.), 64 N. W. Rep., 465. Other cases, however, deny the existence of any distinction between wills which do, and those which do not, contain express clauses of revocation, so far as the revival of undestroyed prior wills is concerned. Reese v. Portsmouth Probate Court, 9 R. I., 434; Boudinot v. Bradford, 2 Dallas, 266; 1 Jarman, 336; Lones v. Lones (Cal.), 41 Pac. Rep., 771; Ennis v. Smith, 55 U. S., 400; Barker v. Bell, 46 Ala., 216; Brown v. Crosby, 69 Ind., 203; Smith v. Chesney, 15 N. J. Eq., 359; Tournoir, 12 La., 19; Ludlum v. Otis, 15 Hun., 410; Clarke v. Ransom, 50 Cal., 595; Newcomb v. Webster, 113 N. Y., 191.

This question has never been directly passed upon in Texas, although it has been held that the destruction of a second will containing an express revocation of all former wills will not have the effect of reviving the first will. Hawes v. Nichols, 72 Texas, 481. That decision goes further and holds that a written declaration properly executed as effectually revokes a will from the date of its execution as does its destruction.

There was a conflict of opinion in England as to whether the destruction of a will, which had revoked a former will either expressly or by implication, would revive the former will, the old common law courts holding that in either case the first will would be revived, and the ecclesiastical courts, which had jurisdiction of wills disposing of personalty, held that in either case the intention of the testator should control. The doctrine of the latter is thus stated: "The legal presumption is neither adverse to, nor in favor of, the revival of a former uncanceled, upon the cancellation of a later revocatory will. Having furnished this principle, the law withdraws altogether, and leaves the question as one of intention purely, and open to a decision either way, solely according to facts and circumstances." Usticke v. Bowden, 2 Addams (Eng. Eccle.), 116. With the exception of New Jersey and Connecticut it is the American rule that the destruction of a later will containing an express revocation of a former one, will not revive the older will. But, as hereinbefore indicated, there is a conflict of opinion as to whether the destruction or cancellation of a later will which has no express revocation clause in it, but merely revokes by implication, will revive the revoked will.

In those cases making a distinction between an express revocation and one by implication it is argued that the express revocation takes place at once, is immediate and absolute, but that in the other the revocation being only implied, if it is destroyed by its author it never takes effect. Scott v. Fink (Mich.), 7 N. W. Rep., 799; Cheever v. North (Mich.), 37 L. R. A., 561, 64 N. W. Rep., 455. We do not see the force in that distinction. The only reason why the express revocation takes effect at once is because it shows beyond doubt that such was the desire and intention of the testator, but does express, positive language make it any plainer that a revocation is desired than a disposition of the

whole property in a way utterly inconsistent with that in the former will would do? . The testator in this case bequeathed his property to one who had no claims upon his bounty; he made another will giving his entire property to other and different persons, the bulk of it to a beloved sister. The revocation would be as forcible, clear and explicit as though he had reiterated in language his desire to revoke the former will. If the revocation expressed in words should take place at once, why should not the one based on acts too clear to be misunderstood take effect at once? Raf Welder, nearly a month before he wrote to Dougherty as to the disposition he desired to be made of his property, had in mind a change in the will made in 1900, for he says: "I may never get back alive; I will write you full particulars as to what to do with my stuff." If he had not contemplated a change in his will there could have been no necessity for so writing. In the last letter he wrote he spoke of his former letter in regard to the disposition of his property, and then proceeded to dispose of it in a manner utterly inconsistent with a large portion of the former will. Nothing was left to Mrs. Holscheider in the last will, while in the first the bulk of the property was bequeathed to her. He could not, had he said so in the most forcible language, have shown a stronger desire of depriving Mrs. Holscheider of any interest in the property that she could get from the former will. The moment that he sent it to James R. Dougherty he had published it, and it was a live, active will. It is true that it depended for its future vitality upon the happening of a certain contingency, but if it had contained an express revocation of the former will, the weight of authority is to the effect that the former will would be revoked whether the contingency happened or not, and we can see no reason why a revocation by inconsistent disposition of property would not have the same effect.

In the case of Williams v. Miles (94 N. W. Rep., 705), the subject under investigation was considered by the Supreme Court of Nebraska, and the following conclusion reached: "But the strong tendency in the United States is to follow the rule of the English Ecclesiastical Courts, and hold that, if the testator destroys a subsequent will, revoking a former one either expressly or by implication, such act, of itself, will not revive the former will. (In re Gould's Will, 72 Vt., 316, 47 Atl. Rep., 1082; McClure v. McClure, 86 Tenn., 173, 6 S. W. Rep., 44; Harwell v. Lively, 30 Ga., 315, 76 Am. Dec., 649; Bohannon v. Walcot, 1 How., 336, 29 Am. Dec., 631; 1 Woerner, Probate and Administration, sec. 51.) Following the English Act of 1837, the statutes, wherever this subject has been dealt with by legislation, are all against the doctrine of constructive revival of the prior will. Hence, we may well regard Lord Mansfield's rule as disapproved, and the doctrine of the Ecclesiastical Courts as vindicated. Preferring the latter, we think the rule should be to look to the intention of the testator in every case. Whether the former will is revived depends upon his intention, which is to be deduced from all the circumstances." These views are fully sustained by Pickens v. Davis (134 Mass., 252), and Williams v. Williams (Mass., 8 N. E. Rep., 424).

In the case of Gould's Will (Vt.), 47 Atl. Rep., 1082, it was said: "The most reasonable rule that can be formulated makes the question

of revival depend upon the intention of the testator at the time of the destruction of the revoking will. A presumption does not arise from that act alone that it was the intention to reinstate the former will. The fact that he once superseded that will by another, on account of changed conditions of his estate, or changed circumstances of persons who were dependent upon him, tends to repel such a presumption."

In this case Raf Welder wrote a holographic will which, by a disposition so repugnant to that disposition made of the property in the will executed in 1900, was, to all intents and purposes, a full revocation of it. He sent that will to his trusted attorney and friend, and he must have known that it was in his custody, and yet he made no effort to destroy it. It may be said in this connection that he made no effort to destroy the first will either, but it was shown that it was not in his possession, but in that of Mrs. Holscheider, who kept it securely in the safety vault of a bank. If it was his deliberate intent, as evidenced by the making and publishing of the holographic will, to revoke the first will, that intention, if not shown to have afterwards been changed, should be carried into execution, even though it carried with it the presumption that he wished to die intestate. It would not have been unnatural if he had deliberately made up his mind to die intestate and permit his estate to descend as the law directs that a father's estate shall descend in case of intestacy.

It has been held that, where wills were denied probate on account of having been obtained through undue influence, and because not executed as provided by statute, they could not be used to show revocation because void *in toto*, and this would vitiate the revocation as well as other parts of the will. But the holographic will in this case is not a void instrument, but one that has lost its disposing power because based on a contingency which did not happen. It is at least a "declaration in writing," executed with the formalities required of holographic wills, and the intention is plain to divert the property from Mrs. Holscheider, and, as evincing such intention, is legitimate evidence to go before a jury. (Dudley v. Gates (Mich.), 83 N. W. Rep., 97; Pickens v. Davis, 134 Mass., 252.) As said in the last named case: "Since the enactment of the English Statute of Wills (St. 7 Wm. IV. and 1 Vict. C. 26, sec. 22), the decisions in all courts have been uniform that, after the execution of a subsequent will, which contained an express revocation, or which, by reason of inconsistent provisions, amounted to an implied revocation of a former will, such former will would not be revived by the cancellation or destruction of the later one."

In article 5337, Sayles' Civil Statutes, it is provided that "no will in writing, made in conformity with the preceding articles, nor any clause thereof, or devise therein, shall be revoked except by a subsequent will, codicil or declaration in writing, executed with like formalities, or by the testator destroying, canceling or obliterating the same, or causing it to be done in his presence." The execution, therefore, of a subsequent will, a codicil or declaration in writing, has the effect to annul and revoke a former will, and that revocation would take place upon the publication of the paper, regardless of what might afterwards become of it, and a republication of the former will would be necessary to give it vitality, no matter whether the later will was destroyed

or became inoperative. . This doctrine is sustained by the weight of English and American authority.

Because the court erred in not permitting the letters of Raf Welder to be used as evidence, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Writ of error dismissed for want of jurisdiction.