### CLOVER v. CLOVER et al.    (No. 6423.)

(Court of Civil Appeals of Texas. San Antonio. May 5, 1920. On Motion for Rehearing, Nov. 3, 1920.)

1. Wills ⬅⬆289, 290—What proof of execution and revocation required.

A party attempting to prove the loss of a will must show the constituent fact that it ex-

isted, just as though the will was being proven for probate as a lost instrument, and such requirement is necessary to show a revocation of a former will, under Rev. St. 1911, arts. 3267, 3271, 7859.

2. Wills ⬅⬆302(8)—Reasonable diligence must be shown when proving alleged lost will.

By virtue of Rev. St. 1911, art. 3272, when a written will is not produced, its nonproduction must be proved sufficiently to satisfy the court it cannot be done by reasonable diligence; then the contents must be substantially proved by the testimony of a credible witness who has read the same, or who has heard it read.

3. Wills ⬅⬆306 — Evidence held to sustain finding of revocation by subsequent lost will.

On contest of a will alleged to have been revoked by a subsequent will not produced, evidence *held* sufficient to show the execution and the loss of the subsequent will.

4. Wills ⬅⬆290—Instrument placed in bank under control of testator within rule as to presumption of revocation.

A will placed by testator at a bank was in his control within the meaning of the rule that, where a will, which when last seen was in the custody of the testator, cannot be found after his death, a presumption arises that it has been revoked.

5. Marriage ⬅⬆50(1)—Evidence held to show that marriage with prior husband of contestant of will was invalid.

In a will contest, evidence *held* sufficient to support a finding that an alleged prior husband of contestant, who was contesting as wife of deceased, was a married man, and had induced contestant to marry him, but that no legal marriage was consummated.

6. Evidence ⬅⬆75—Failure to produce evidence within knowledge of party raises presumption against him.

The failure to produce evidence peculiarly within the knowledge of a party will raise a presumption against him. and every reasonable intendment will be in favor of his opponent on that issue.

7. Evidence ⬅⬆77(4)—No presumption that husband, not called, would testify differently from wife as to validity of marriage.

In a contest of a will by one claiming to be the wife of deceased, but claimed to be the wife of another, *held*, that there was no presumption that the alleged first husband of contestant was under the control of the contestant, and that he would testify concerning his alleged marriage with the contestant differently from contestant merely because she did not produce him upon the trial, it having been shown that contestant had threatened to prosecute him for inducing her to go through the form of a marriage with him when he had a wife living.

8. Marriage ⬅⬆11—Where there was no ceremony, and one party had a wife living there was no marriage.

Where a married man deceived a girl into the belief that they had been married by delivering to her the original marriage license,

---

and she lived with him as his lawful wife according to her belief until she learned that he had a wife living, whereupon he went away fearing prosecution, she was not his wife at all and was free to marry another.

### On Motion for Rehearing.

**9. Appeal and error ⊚⇒265(1)—Exception not necessary for attack on correctness of findings made.**

An attack on the correctness of findings actually made by the court may be made without further predicate than an exception to the judgment of the court.

Appeal from District Court, Webb County; J. F. Mullally, Judge.

Application by Francisco Clover for probate of the will of W. C. Clover, deceased, contested by Paula Moreno de Clover and another. Judgment for contestants, and proponent appeals. Affirmed.

T. C. Mann, of Laredo, for appellant.

A. C. Hamilton, John A. Pope & Son, A. Winslow and W. W. Winslow, all of Laredo, for appellees.

COBBS, J. As appellees have adopted appellant's statement of the case, we likewise adopt it and set it out, as follows:

"The appellant, Francisco Clover, filed his application for probate of the will of W. C. Clover, deceased, the will accompanying the application, in the probate court of Webb county, Tex., the will filed for probate being dated March 14, 1891, and giving all property of the testator to Francisco Clover and Henry E. Clover, brothers of the testator.

"The application further alleged the death of W. C. Clover on February 1, 1919, in Laredo, Webb county, Tex., and represented the property left by deceased to be located in Webb county, Tex. The appellees, Paula M. de Clover and her son, Patricio Clover, filed their contest to the probate of said will, alleging that Paula M. de Clover was the lawful wife of the testator, W. C. Clover, and that Patricio Clover was a son of the said Paula Moreno de Clover and the testator, W. C. Clover, and further alleging that the will offered for probate by appellant was revoked by the testator by a will made by said testator subsequent to the will offered for probate.

"Appellant by supplemental petition denied that Paula Moreno was ever the wife of the testator, and alleged that she was the wife of one Neofito Barboza, having married said Barboza in Starr county, Tex., in 1878, and having lived with the said Barboza and had two children by him, that said Barboza was still living, and that the said Paula Moreno de Clover had never obtained a divorce from the said Neofito Barboza, and that the said Neofito Barboza had never obtained a divorce from the said Paula Moreno de Clover, and further denied that the said Patricio Clover was a legitimate son of the said testator, W. C. Clover, and Paula Moreno, and denied the right of both of the contestants to contest the probate of said will, and further denied the execution by the testator of a subsequent will to the one offered for probate.

"The contestants, by supplemental pleading, alleged that Neofito Barboza had married a woman in Mexico in the year of 1878, and that said wife married by him in Mexico was still living in 1878 at the time the said Neofito Barboza and Paula Moreno were alleged to have attempted to enter into a marriage contract, and that the said Neofito Barboza was, by reason of having a living wife in Mexico, incapable of entering into a marriage contract with Paula Moreno in 1878, that there was no marriage between the said Neofito Barboza and Paula Moreno, and that said Paula Moreno was capable of entering into a marriage contract with W. C. Clover, the testator, and did enter into a valid marriage contract with the said W. C. Clover, and that the said Patricio Clover was the lawful son of the said testator and Paula Moreno.

"The contestants by trial amendment set up fraud on the part of Neofito Barboza on the contestant, Paula Moreno de Clover, alleging that Neofito Barboza represented to Paula Moreno de Clover, on October 30, 1878, that he had obtained a license, and that they were married when in fact no ceremony had been performed uniting them in marriage, that the license obtained authorizing the marriage was never executed by any officer or person authorized to perform a marriage ceremony, and that the license was handed to Paula Moreno by the said Neofito Barboza, and that she placed said marriage license away in her trunk believing until about 1884 that the said Neofito Barboza was a single man and capable of entering into a marriage contract with her, when she discovered that he had a wife living in Mexico at the time that the fraud was perpetrated on her by the said Neofito Barboza, and alleging that she never in fact was the wife of the said Neofito Barboza.

"The appellant filed a general denial, denying the allegations set up in said trial amendment.

"The case was tried in the county court before a special judge, and the probate of the will was denied. Proponent excepted to the judgment of the county court, and gave notice of appeal to the district court of Webb county, filed his appeal bond, and case was regularly appealed to the district court of Webb county.

"The case was tried in the district court of Webb county before the court without a jury, and judgment rendered denying the probate of said will, to which judgment of the court appellant duly excepted and gave notice of appeal to the Court of Civil Appeals of the Fourth Supreme Judicial District."

Without setting out the assignments in detail and discussing them separately, as they all attack the ruling of the court in not probating the will presented by proponent, the appellant herein, as the last will and testament of W. C. Clover, deceased, they will all be considered in one general discussion.

If the ruling of the court was correct in

refusing its probate, it is not very important to go much further with the discussion of other assignments challenging rulings on other issues.

The findings of facts and conclusions of the court are as follows:

### "Findings of Fact.

"(1) W. C. Clover wrote and signed a will as his last will on March 14, 1891, by which he devised all his property to his two brothers, Henry E. Clover and Francisco Clover (the proponent). He was then over 21 years of age and was of sound mind. This instrument was all in his own handwriting and signed by him without subscribing witnesses, and is the will offered for probate herein by proponent.

"(2) W. C. Clover and Henry E. Clover lived in Laredo, Tex., where they were in the mercantile business. Their brother, Francisco Clover, lived in New York, and had an interest in said mercantile business, also in certain real estate in Laredo which they owned in common. When said will was executed by W. C. Clover he sent it to his brother Francisco, who received it, and has ever since said time had it in his possession up to the time he offered it for probate in the county court of Webb county.

"(3) Henry E. Clover, one of the devisees in said will, died about the year 1911.

"(4) W. C. Clover died in Laredo, Tex., February 1, 1919. He was a resident of Laredo, in Webb county, where his estate, or the greatest part of it, is situated.

"(5) Citation herein has been served and returned in the manner and for the length of time required by law.

"(6) On or about October 30, 1878, Neofito Barboza, a married man having a wife and children in Montemorelos, Mexico, and who was then working in Rio Grande City, Tex., induced Paula Moreno, a young girl of Camargo, Mexico, to go across the river to Rio Grande City to marry him, she not knowing that he already had a wife. That day in Rio Grande City he brought to and gave her a written instrument which he told her was her marriage certificate, saying that they had been married according to American law. The instrument was in English, it had a seal on it, she could not read it, and she believed that she was married to him according to American law, as he said. That evening Barboza came to her with two friends and an American who could speak no Spanish. Barboza told her that the American was an official or a judge, but the American did nothing and later went away. No ceremony was performed. The said written instrument was a marriage license issued that day by the clerk of the county court of Starr county authorizing the marriage of Neofito Barboza and Paula Moreno, and was produced in evidence upon the trial of this cause by Paula Moreno de Clover, one of the contestants herein. The printed form thereon, to be filled out by the minister or officer celebrating a marriage, is left blank. A certified copy issued July 15, 1919, also in evidence, from the records of marriages of Starr county, shows the issuance of said marriage license, but shows no return or action thereon.

"(7) Neofito Barboza and Paula Moreno lived together as husband and wife from October 30, 1878, in Rio Grande City, San Diego, Tex., and other places until about 1880, when they came to Laredo, where they continued to live together as husband and wife until about 1884, when Paula Moreno found in Barboza's trunk a letter from his mother in Montemorelos dated in August, 1878, asking him to come home to his wife and daughter, and two letters of later date from his wife. Paula Moreno then charged her supposed husband, Barboza, with having deceived her in Rio Grande City into marriage with him when he had a living wife in Mexico, and he admitted it. She then threatened him with legal proceedings, and he left for Mexico, saying he would come back, but he has never been in Laredo since. Paula Moreno has ever since lived and still lives in Laredo. Two children were born to her and Barboza, named Berta Barboza (now Phillips) and Jose Barboza, both of whom live in Laredo. Neofito Barboza has never contributed anything to the support of Paula Moreno nor of his said two children since he went away in 1884.

"(8) W. C. Clover (the deceased) and Paula Moreno commenced living together in 1888, and thereafter continued to live together openly, with short interruptions, until the time of his death on February 1, 1919, when he died in her arms. Five children were born to them, all of whom are now dead except Patricio Clover (one of contestants), the eldest, now about 30 years of age, the other four, having died before their father W. C. Clover. These children were all recognized by W. C. Clover as his children, and he treated them with kindness and affection and supported them and their mother and sent them to school. He also supported Berta and Jose Barboza and sent them to school until they were old enough to take care of themselves. He took Paula Moreno on occasional pleasure trips, introducing her and treating her as his wife.

"(9) On February 1, 1914, W. C. Clover and Paula Moreno de Barboza were legally married in Laredo by N. Idar, justice of the peace, and due return thereof made.

"(10) On April 13, 1916, W. C. Clover filed suit in the district court of Webb county against Paula Moreno de Barboza for annulment of marriage, on the alleged ground that she was married to Barboza in Rio Grande City in 1878, and had never been divorced from him, and that Barboza was still living. This suit resulted in judgment for defendant on June 25, 1917, and thereafter Clover and his wife resumed their marriage relation.

"(11) On December 30, 1896, a personal disagreement and difficulty occurred in Laredo between Francisco Clover (the proponent) and his brother, W. C. Clover, and on that day Francisco Clover brought suit in the district court of Webb county for debt and partition against his brothers, W. C. and H. E. Clover. The defendants in their answer filed January 6, 1897, asked for affirmative relief. Plaintiff dismissed his suit January 9, 1897. The suit was reinstated February 13, 1897. Judgment for partition and damages was rendered for defendants on May 8, 1897, and on August 3, 1897, part of the property allotted to Francisco Clover in the partition was sold to satisfy the money judgment recovered against him by defendants.

"(12) About 1911 W. C. Clover told W. B. Heaner, who had charge of his rentals, that he intended to give the bulk of his property to Miss Barboza at his death.

"(13) In 1911 or 1912 W. C. Clover told Berta Barboza that a long time before then he and his brothers had made their wills in favor of each other, and that he intended to revoke the will he had so made. He did not know whether Francisco had kept it or not. At another time he borrowed a dollar of her, and later he reminded her of it, and said he was not going to pay it back, and asked her if she knew that sometimes there were papers made out that in consideration of a dollar and other things, people would sell property that way, to which she replied that she did. He told her that she would lose nothing by it; that she and her mother and brothers would not suffer no matter when he died. At another time later he came to her and showed her a written instrument, which she · supposed was a will, giving his property to her, and her mother and brothers, through her. It was all in his handwriting and signed by him, W. C. Clover. It was not acknowledged. It was dated in 1911 or 1912. She read some of it and he read some of it. It stated that he wanted Christian burial and wanted to be buried in Greenwood Cemetery in Brooklyn, N. Y. It named her executrix and gave his property for the benefit of her mother and her half-brothers' Eduardo and Patricio, naming them. On cross-examination the witness who gave this testimony (Berta Barboza Phillips) said: 'The paper recited the consideration of $1.' It conveyed the property to her, to hold in trust for her mother and Eduardo and Patricio. On redirect examination she said: 'It is possible that I am confusing his former conversation about the dollar with the language of the paper. I am not certain that the paper mentioned the dollar. I don't remember.'

"(14) About the latter part of 1911 or the first part of 1912 W. C. Clover showed a paper, which he said was his will, to Aaron Johnson, a law clerk, printer, and newspaper man. He said that he made this will himself and asked Johnson if he didn't think that he (Clover) was a pretty good lawyer. Together they read over the paper, which was put on the desk before them. To the best of Johnson's recollection, the paper contained a clause revoking all wills theretofore made by him, a direction that he should be buried in a Christianlike manner, and left his property to Berta Barboza and Paula Moreno de Clover, and also the names of Patricio Clover and Eduardo Clover appeared. (Eduardo Clover, a son of W. C. Clover and Paula Moreno, died in 1918.) The paper was signed W. C. Clover and had no subscribing witnesses. It was all in handwriting. Johnson believes it was W. C. Clover's handwriting, but was not very sure, as he did not know it well.

"(15) On his last visit to New York in 1918 W. C. Clover told proponent that he had made a will in which he directed that he be buried in Greenwood Cemetery and that he had left the will at the Merchants' State Bank & Trust Company, Laredo, Tex.

"(16) Neofito Barboza is still living. He goes under the name of N. B. Sada. He was in Waco, Tex., in May, 1919, where proponent located him, and where proponent's attorney interviewed him, in an effort to get his deposition for use in this case at the trial in the county court. On May 10, 1919, he telegraphed Paula Moreno: 'Two letters to Jose not answered. What shall I do?' This telegram was received, but not answered. Shortly after proponent's attorney interviewed Barboza in Waco a man whom he called Jose came and had a talk with him, and thereafter Barboza disappeared before his deposition could be taken, and has not since been located.

"(17) Jose Barboza has been in New Laredo, Mexico, since the second day of this trial, on which day a subpœna was issued for him as a witness for proponent, but not served.

"(18) Contestant Paula Moreno de Clover has known that Neofito Barboza was alive for several years past, although she denied it. She did not want his testimony in this case. Neither she nor her children feel any interest in him.

"(19) Since the death of W. C. Clover no will has been found among his papers, although looked for at the Merchants' State Bank & Trust Company, and his attorney's office, and at his home. Its whereabouts, if it is in existence, is unknown to the parties hereto.

"(20) After proponent learned that the will sought for could not be found, he filed application herein to probate the will dated March 14, 1891.

"Conclusions of Law.

"(1) Paula Moreno was never the wife of Neofito Barboza. When he deceived her into the belief that they had been married in Rio Grande City according to American law, by delivering to her the original marriage license issued by the county clerk of Starr county in 1878, she commenced to live with him as his lawful wife according to her belief, and continued to so live with him until 1884, when she learned of his prior marriage in Mexico, whereupon he went away, fearing prosecution. She was not his common-law wife. Whether or not she could claim any right as against Barboza for what he had done at Rio Grande City, still she was not bound as a married woman thereby, and she was free to marry W. C. Clover when she was married to him by Justice Idar in Laredo February 1, 1914. She had then been the common-law wife of W. C. Clover for many years.

"(2) W. C. Clover having always recognized Patricio Clover as his son, Patricio became a legal heir of his father when said marriage took place on February 1, 1914, and as such legal heir he is entitled to contest the probate of the will offered by proponent.

"(3) The facts in evidence are sufficient to prove that W. C. Clover did make a valid will about 1911 or 1912 revoking the will dated March 14, 1891, and making a different disposition of his property. Although it cannot be produced in evidence, because not found, it is effective as a revocation of the former will. Hence the will of March 14, 1891, offered by proponent is not entitled to probate as the last will of W. C. Clover, deceased. Probate refused."

There is but one vital question to be determined: Was the will offered for probate revoked by a subsequent will?

There is no application to probate a sub-

sequent will at all; appellee simply contending that the will presented by appellant to be probated, if it ever existed, had been revoked by a subsequent will, in either of which case appellant would have no interest.

The learned trial court found that the instrument presented was executed as the last will of decedent, and that would admit it to probate if the finding had stopped there. The court proceeded further, and found that it had been revoked by a subsequent will. The court's finding is challenged as to the sufficiency of the evidence under the law to support this finding. If there is any evidence sufficient to support this finding, we will not disturb it.

Francisco Clover and W. C. Clover had a personal disagreement in 1896, and Francisco sued his brother, applied for partition of certain property held by them jointly, which resulted in a division of the property, and the part allotted to Francisco was sold to satisfy a judgment against him by the defendant. The decedent in 1911 stated he intended to change his former will. He told Berta Barboza, in 1911 or 1912, he had long prior thereto exchanged wills with his brother in favor of each other, and that he intended to revoke it, as he did not know whether Francisco had kept it or not. He afterwards exhibited to her a will giving his property to her and her mother and brothers. It was all in his handwriting, signed by him, dated in 1911 or 1912. She stated some of its contents. About the same time he exhibited a paper which he said was his will to Aaron Johnson, a law clerk, printer, and newspaper man, and they read it over together, which he put in his desk before him, or in his presence. It contained a clause revoking all other wills, with directions as to his burial, etc., giving names of his beneficiaries, which he supposed to be in the testator's own handwriting.

On the last visit, in 1918, to New York, W. C. Clover told proponent that the will was left by him at the Merchants' State Bank & Trust Company, Laredo, Tex. After his death a search was made, and the will was not found there or at his attorney's office or his home.

These findings are fully sustained by the evidence. Are the findings of the court sufficient to establish a revocation of the previous wills?

Articles 3267 and 3271, R. S., provide how a written will may be proved, also what facts must be proved. Article 7859 provides how a will may be revoked. Morgan v. Davenport, 60 Tex. 230.

[1] It is incumbent upon a party attempting to prove the loss of a will to show the constituent facts that it existed just as though the will was being proven for probate, as a lost instrument. This requirement is necessary to show a revocation of a former will. Tynan v. Paschal, 27 Tex. 286, 84 Am. Dec. 619.

[2] By virtue of article 3272, R. S., when a written will is not produced, its nonproduction must be proved sufficiently to satisfy the court it cannot be done by reasonable diligence; then the contents must be substantially proved by the testimony of a credible witness who has read the same, or who has heard it read.

[3, 4] In this case the findings of the court meet every requirement with reference to establishing the later will—its existence and loss.

In the case of McElroy v. Phink, 97 Tex. 147, 76 S. W. 753, the court said:

"The case was tried before the judge without a jury, and the first error assigned in the Court of Civil Appeals and in this court is to the effect that the trial court erred in holding that there was sufficient evidence to authorize a finding that the will had not been revoked. The authorities are practically in accord upon the proposition that where a will which, when last seen, was in the custody of the testator, cannot be found after his death, a presumption arises that it has been revoked. The proposition is evidently based upon the theory that it is a reasonable inference from the facts that the custodian, who in such case is the testator, has destroyed it for the purpose of revoking it."

This will was shown by the statement of the testator to have been placed by him at the Merchants' State Bank & Trust Company, Laredo, Tex., and therefore was in his control. The proper search was made for it after his death, and it could not be found. The fact is sufficiently established both as to its execution, its deposit and loss, which must be considered to have been in the possession and under the control of decedent. At any rate, the existence of that will has been established, and, that being so, the court did not need to go further to refuse probate of the will first executed. Dougherty v. Holscheider, 40 Tex. Civ. App. 31, 88 S. W. 1113; Hawes v. Nicholas, 72 Tex. 481, 10 S. W. 558, 2 L. R. A. 863; 40 Cyc. p. 1178, and note; McElroy v. Finck, 97 Tex. 147, 76 S. W. 754; Buchanan v. Rollings, 112 S. W. 786; 40 Cyc. p. 1195; 40 Cyc. pp. 1297–1299; 40 Cyc. p. 1290.

Appellee objects to this court considering the third, fourth, fifth, sixth, seventh, and eighth assignments of error, as no bill of exception was filed, and says there is no fundamental error shown committed. "The second fall term of the district court of Webb county, Tex., at which this case was tried, adjourned January 24, 1920. The findings of fact and conclusions of law requested by proponent were filed January 29, 1920. Appellant, proponent, filed an instrument indorsed 'Proponent's Exceptions to the Court's Findings of Fact and Conclusions of Law' April 3, 1920, about 70 days after the adjournment of court. This instrument is not approved by the court, nor is it in the nature of a bill of exceptions." While there is merit in the contention, we will consider the assignments.

[5] There is ample evidence to support the court's finding that Neofito Barboza was a married man, had wife and children in Montemorelos, Mexico, on October 30, 1878, and that he induced Paula Moreno, a young girl of Camargo, Mexico, to cross the river to Rio Grande City and marry him, but no legal marriage was consummated because he was a married man at the time. The third assignment is overruled.

Appellant, in the fourth assignment, insists, as in above, that because the court found Neofito Barboza was a married man in Mexico October 30, 1878, it could be shown by his testimony no such marriage existed; that contestants were in touch with him and induced him to leave and go to parts unknown so that his testimony could not be secured.

[6] We understand the rule, which is well settled by authority, to be that the failure to produce evidence peculiarly within the knowledge of a party will raise a presumption against him, and every reasonable intendment will be in favor of his opponent on that issue. Conceding, for the sake of argument, everything appellant insists upon, there is nothing to show that he would contradict the facts proven. The proof shows that when he married this young girl, and all the time he lived with her, and she bore children to him, he was knowingly imposing on her and breaching the sacred marital relations of the land. He moved to Laredo with her, and there she, in 1884, discovered his perfidy, through letters from his own mother to him, calling on and appealing to him to come home "to his wife and daughter," besides two letters from his wife, and, when confronted with those letters, she threatened him with legal proceedings, whereupon he left for Mexico, and has never returned to Laredo and never contributed to the support of Paula nor to his two children during all these years after he went away in 1884 and abandoned them to their fate.

[7] One of the attorneys, T. C. Mann, testified that after he was employed by appellant in this case he attempted to locate Neofito Barboza, and had information that Barboza was in Waco; that he went there to see him and saw him and had two conversations with him, and that Barboza stated that he had married Paula Moreno at Rio Grande City in 1878 and lived with her until about 1884, and that he (Barboza) had resided at different places in the United States and Saltillo, Mexico, and in Montemorelos, Mexico, and had seen his children, Jose and Berta; that at the first conversation Barboza denied his identity, but later admitted that he was Neofito Barboza, but sometimes went by the name of N. B. Sada. Even though he stated such facts to Mr. Mann, it does not contradict or destroy the proof that he had previously married. We copy Mr. Mann's statement as presented from his own brief and his own standpoint, and there is no denial of this contention of his previous marriage. He did not deny it to Paula when confronted with the letters in Laredo in 1884. He fled immediately to Mexico, presumably to his wife and children, fearing, no doubt, a criminal prosecution. When he is discovered in Waco by Mr. Mann, he is under the assumed name of N. B. Sada, and, when so discovered, again he flees. There is no presumption that he is under the control of appellees or would testify contrary to the court's findings, and, if he were here and testified, that the result would be different than it is.

This assignment is overruled.

[8] We overrule the appellant's fifth assignment, complaining that the court erred in paragraph 9 of the findings, holding that W. C. Clover and Paula Moreno Barboza were legally married, for the proof fully sustains the findings.

We overrule assignment No. 6, complaining that the court erred in finding that Neofito Barboza and Paula Moreno were never lawfully married, for such finding is supported by the evidence.

We overrule the seventh assignment of error, complaining that the court erred in holding in paragraph No. 3 of the conclusions, in effect, that W. C. Clover made a valid will in 1911 revoking the one dated March 14, 1891, making a different disposition of his property. This has been discussed.

We overrule for reasons heretofore given appellant's eighth assignment, to the effect that Neofito Barboza was not capable of entering into a marriage contract with Paula Moreno on October 30, 1878, because Neofito Barboza had a living wife undivorced on October 30, 1878, in Mexico, as the evidence showed that Neofito Barboza was within the control of the contestants.

We have considered each and all the assignments and propositions presented and urged by appellant, and in fact discussed them in a general way, and, finding no reversible error assigned, they are overruled, and the judgment is affirmed.

On Motion for Rehearing.

[9] We find no merit in the motion for rehearing, but conclude that the statement should be withdrawn to the effect that the objection to the consideration of assignments 3 to 8, inclusive, is meritorious. These assignments do not complain of the failure to make additional findings of fact. They constitute attacks upon the correctness of the findings as made, and such an attack may be made without further predicate than an exception to the judgment of the court. Voight v. Mackle, 71 Tex. 78, 8 S. W. 623; Patten v. Herring & Kelley, 9 Tex. Civ. App. 640, 29 S. W. 388; Smith v. Abadie, 67 S. W. 1077; Brenton v. Peck, 39 Tex. Civ. App. 224, 87 S. W. 898; Thompson v. State, 23 Tex. Civ. App. 370, 56 S. W. 603; Temple v. Land Co., 81 S. W. 1188.

Motion for rehearing overruled.