## MAY et al. v. BROWN.

### No. 11448.

Court of Civil Appeals of Texas.
San Antonio.

Nov. 29, 1944.

Rehearing Denied Jan. 3, 1945.

Strickland, Ewers & Wilkins and Magus F. Smith, all of Mission, for appellants.

Taylor, Wagner & Taylor, of Brownsville, and Carter & Stiernberg, of Harlingen, for appellee.

MURRAY, Justice.

This is an appeal by Cathryn May and Medwin Hall, joined pro forma by their respective husbands, from a judgment of the District Court of Cameron County admitting to probate a will of their father,

John C. Fanning deceased, dated March 30, 1943.

The trial in the district court began to a jury, but at the close of the testimony the trial judge overruled a motion for peremptory instruction by contestants and granted a motion for a peremptory instruction by the proponent of the will, Mrs. Jean W. Brown, and then, in accordance with such instructed verdict, entered judgment admitting the will of John C. Fanning, dated March 30, 1943, to probate.

We shall first consider appellants' contention that the court erred in granting appellee's motion for an instructed verdict.

The facts are as follows: Prior to 1928 and up to the time of his death on December 26, 1943, John C. Fanning was the owner and operator of the Capitol Theater, a moving picture business in the City of Brownsville, Texas. In 1928 he began to keep company with one Mrs. Jean W. Brown, and in 1933 his family, consisting of a wife, two daughters and one son, left him and moved to Fort Worth, Texas. His wife, Mrs. Bertha F. Fanning, never again returned to Brownsville to live. There is evidence that some eight years before his death John C. Fanning went to Fort Worth and visited his family and he and his wife lived together for a short period as man and wife. Shortly before his death his son, M. D. Fanning, visited him in Brownsville and Fanning was more than delighted to see his son. John C. Fanning was a drinking man and sometimes drank as much as a quart of whisky per day. After Fanning's family left Brownsville, Mrs. Jean W. Brown moved into Fanning's apartment and became his housekeeper and practical nurse. Fanning was not well at times and was compelled to eat specially prepared food. Mrs. Brown prepared this food for him. She nursed him when he was sick and cared for him in many ways. Fanning was very appreciative of what Mrs. Brown did for him and promised to provide for her in his will. He referred to her as his guardian angel.

On or about March 30, 1943, Fanning went to a lawyer's office in San Antonio and had a will written, in which he left half of his estate to Mrs. Brown and half to his wife, Bertha F. Fanning. This bequest to Mrs. Fanning was stated to be in lieu of her community interest.

■ Shortly before his death Mr. Fanning began to think more about his family and especially so after his son visited him. He executed a new will, wholly in his own handwriting and asked two young ladies who worked for him to sign as witnesses. This will could. not be found after his death and must be presumed to have been destroyed by him with the intention of revocation. There is no evidence as to the provisions of this will. It is not even shown whether or not it contained a revoking clause. Fanning told his son that he had made a prejudicial will, but that he had changed that, he had made a new will in which he had made his son executor. Fanning made statements indicating that he wanted his family to have the enjoyment of his property. He told his son he wanted him to occupy his chair in his office, evidently meaning that he wanted his son to take over the management of the theater.

Mrs. Brown told someone that Mr. Fanning was changing everything over, and she did not see why, because his family had never done anything for him. About this time he made his wife beneficiary in his insurance policy and sent $250 to each of his children and $2,500 to his wife. This was also about the time he executed the new will. Shortly before executing the new will he asked two lawyers, with whom he associated at the Elk's Club, if a will written wholly in his own handwriting would be a valid will and was informed that it would be.

Fanning was taken sick in the Elk's Club and carried to his apartment, where he died on December 26, 1943. Mrs. Brown and others were present when he died. She had those present take everything out of his pockets, including his keys, and give them to her. She sent her son down to the office, according to some of the witnesses, to see if he could find a will, and according to others, to see if he could find Mrs. Bertha F. Fanning's address. The son came back with a telegram and said that was all he could find. Another witness testified he saw the son coming out of Mr. Fanning's office with a tin box under his arm. This tin box was later found in the apartment. There is some probability that the second will might have been in this tin box.

■ At the outset, it must be borne in mind that this is an application to probate the will of John C. Fanning, which is governed by the provisions of Art. 3348, Vernon's Civ.Stats., reading as follows:

"Art. 3348. Facts which must be proved

"Before admitting a will to probate, it must be proved to the satisfaction of the court:

"1. That the testator, at the time of executing the will, was at least twenty-one years of age, or was married, that he was of sound mind, and that he is dead.

"2. That the court has jurisdiction of his estate.

"3. That citation has been served and returned in the manner and for the length of time required by law.

"4. That the testator executed the will with the formalities and solemnities and under the circumstances required by law to make it a valid will.

"5. That such will has not been revoked by the testator."

It is not a suit to set aside the probate of a will already admitted to probate. If it were of the latter nature we would have no difficulty in saying that the evidence was insufficient to support a finding that the will of March 30, 1943, had been revoked by John C. Fanning, the burden of proof being upon the parties attacking the probated will to establish such fact by a preponderance of the evidence. Article 5534, Vernon's Ann.Civ.Stats.; Chambers v. Winn, Tex.Civ.App., 133 S.W.2d 279; 44 Tex. Jur. p. 573, Sec. 33.

■ The case at bar presents a very much more difficult question. Subdivision 5 of Article 3348 places the burden of proof upon a party offering a will for probate to show by a preponderance of the evidence that such will has not been revoked by the testator. Therefore, unless the evidence in this case conclusively shows that the will of March 30, 1943, had not been revoked by John C. Fanning, then and in that event at least a question of fact was raised which should have been submitted to the jury. Carlson v. Carlson, Tex.Civ.App., 272 S. W. 823.

This brings us to an examination of the evidence before us. Proponents produced the will of March 30, 1943, in court, its execution was established, it was not mutilated or destroyed. There is no suspicion cast about the original execution of this will. Appellants contend that they have cast such suspicion upon the execution of this will, but we cannot agree. We take it that the evidence is overwhelming that on March 30, 1943, John C. Fanning duly executed the will offered for probate, with all the formalities and solemnities required by Art. 8283, Vernon's Ann.Civ.Stats. It therefore follows that the will should be probated unless it was subsequently revoked by the testator.

■ It is settled law in this State that where a written will is produced in court and its proper execution shown, unattended by suspicious circumstances casting doubt upon its genuineness, and where such will has not been destroyed or mutilated in any way, there arises a presumption of continuity, the requirement of Subdivision 5 of Article 3348, supra, has been met, and such proponents are not required to go further and offer evidence of the negative fact that such will has not been revoked. McElroy v. Phink, 97 Tex. 147, 76 S.W. 753, 77 S.W. 1025; Womack v. Woodson, Tex. Civ.App., 169 S.W.2d 786; Wilson v. Paulus, Tex.Com.App., 15 S.W.2d 571; Redmond v. Redmond, Tex.Civ.App., 127 S.W. 2d 309; Sien v. Beitel, Tex.Civ.App., 289 S.W. 1057.

■ It therefore follows that if the probate of such a will is to be denied, the burden then rests upon the contestants to go forward with the evidence and offer sufficient testimony to at least raise the issue that such will has been revoked. Art. 8285, Vernon's Ann.Civ.Stats., provides, in effect, that a duly executed will can be revoked only in two ways. One is by the will being destroyed by the testator, or under his direction, and the other is by subsequent will, codicil or declaration in writing, executed with like formalities as is required of original wills. There is no contention that the will of March 30, 1943, was ever destroyed by anyone, so if it was revoked it must have been by the execution of a new will by John C. Fanning, some time between December 3 and 5, 1943. We take it that the testimony of the subscribing witnesses was sufficient to show that Fanning executed a new will, between December 3 and 5, 1943, but the witnesses do not attempt to testify to any of the contents of that will, not even that it contained a revoking clause. The other testimony offered by contestants, such as the declaration of John C. Fanning and Mrs. Jean W. Brown were admissible to show the existence of a subsequent will, but not its contents. Williams v. Miles, 68 Neb. 463, 94 N.W. 705, 96 N.W. 151, 62 L.R.A. 383, 110 Am.St. Rep. 431. There is not one scintilla of evidence in this record as to the contents of the last will. We are left entirely in the dark as to whether or not such will con-

tained a revoking clause or whether its provisions were consistent or inconsistent with the provisions of the former will. If the subsequent will contained no express revoking clause then it would revoke the first will only to the extent that it conflicted with the former will. Under such circumstances it is necessary to prove the provisions of the subsequent will in order to know to what extent it revokes the former will. All provisions of the former will that are not in hopeless conflict with the provisions of the second will must be given effect. It would be the duty of the court to construe the two wills together and give effect to both, if possible, and not strike down any provision of the former will unless there was no reasonable way of reconciling the two provisions. The court cannot do this unless the contents of the second will are shown. It is not a question of what Fanning might have intended doing, or what he may have attempted to do. The question is what did he actually do when he executed the subsequent will.

■ Appellants point out that Art. 8285, supra, provides that a will may be revoked by the execution of a subsequent will, but this Article cannot be construed to mean that in every instance where a subsequent will is executed all former wills are ipso facto revoked by the testator. A testator may have two or more valid wills, or he may have many codicils to his valid will. Warnken v. Warnken, Tex.Civ.App., 104 S.W.2d 935; Harmon v. Ketchum, Tex.Civ.App., 299 S.W. 682; Neibling v. Methodist Orphans' Home Ass'n, 315 Mo. 578, 286 S.W. 58, 51 A.L.R. 639; Adams v. Maris, Tex.Com.App., 213 S.W. 622; Grimes v. Nashville Trust Co., 176 Tenn. 366, 141 S.W. 2d 890; Richardson v. Ames, Tex.Civ.App., 2 S.W.2d 517; Williams v. Miles, 68 Neb. 463, 94 N.W. 705, 96 N.W. 151, 62 L.R.A. 383, 110 Am.St.Rep. 431; Dougherty v. Holscheider, 40 Tex.Civ.App. 31, 88 S.W. 1113.

■ The evidence offered by contestants was insufficient to overcome the presumption of continuity created by producing the unmutilated written will, and duly proving its execution, without there being any evidence to cast a suspicion upon its genuineness.

Appellants rely strongly upon the cases of Clover v. Clover, Tex.Civ.App., 224 S.W. 916, and In re Brackenridge's Estate, Tex. Civ.App., 245 S.W. 786. These cases are not in point on the facts. In each of these cases it was shown that the alleged subsequent will contained a revoking clause, while in the case at bar there is no evidence that the subsequent will contained a revoking clause.

Appellants' contention that the trial court erred in granting appellee's motion for an instructed verdict is overruled.

It follows, from what has been said, that appellants' contention that the court should have granted their motion for an instructed verdict, or at least have submitted the question of revocation to the jury, will also be overruled.

■ Appellants contend that the evidence was sufficient to raise the issue of want of mental capacity on the part of John C. Fanning, at the time he executed the will of March 30, 1943. There were any number of witnesses who testified, in effect, that up to the time of his death John C. Fanning was of normal mental capacity, running his picture show, tending to his business and playing games with his friends at the Elks Club. Against this, one witness testified that about one year before Fanning's death he noticed something abnormal about Fanning's mental condition. Another witness testified that he made a settlement with Fanning with reference to debts owed by the Yacht Club and that afterwards he talked to Fanning and he had forgotten about the settlement. Dr. J. J. McKenzie testified that from the medical record from the Santa Rosa Hospital, copy of which was furnished him, the troubles named in the diagnosis or chart of the patient would affect his mind, but it depended upon the amount of fluid stored and the amount of toxicity. The evidence offered by appellnats was insufficient to raise a jury question as to the want of mental capacity on the part of Fanning to make a will. The appellants are in the unenviable position of urging that in March, 1943, John C. Fanning did not have sufficient mental capacity to make a will, but that later, in December, 1943, he did have such mental capacity. The trial court properly refused to submit the issue of mental capacity to make a will to the jury.

The judgment is affirmed.