In re BRACKENRIDGE'S ESTATE.*
(No. 6814.)

(Court of Civil Appeals of Texas. San Antonio. Oct. 25, 1922. Rehearing Denied Nov. 28, 1922.)

1. Wills ⬦167—Methods of revocation stated.

Under Rev. St. 1911, art. 7859, a will in writing, made in conformity with law or any clause or devise therein, cannot be revoked except by a subsequent will, codicil, or declaration in writing executed with like formalities, or by testator destroying, canceling or obliterating the will or causing it to be done in his presence.

2. Wills ⬦186—Requisites of declaration in writing to revoke will stated.

In order to constitute a declaration in writing a revocation of a will, it should either be signed by the testator and attested by two or more credible witnesses above 14 years of age, or by a declaration written wholly by the testator.

3. Wills ⬦186—Disposition of property previously devised not necessary in writing revoking former will.

Under Rev. St. 1911, art. 7859, it is not necessary that a writing expressly revoking former wills should make a disposition of the property previously devised, as the subsequent writing need not be a will, and an instrument purporting to be a will, but inoperative in other respects, may be operative as a revocation of a former will.

4. Wills ⬦119—Publication of will not holographic stated.

Under Rev. St. 1911, art. 7857, the publication of a will not holographic is made by testator's signing the instrument and requesting the attestation of two or more witnesses over 14 years of age by subscribing their names thereto in the presence of the testator.

5. Wills ⬦133 — Attestation of subscribing witnesses to holographic will not necessary.

Where a will is wholly written by the testator, the attestation of subscribing witnesses may be dispensed with under Rev. St. 1911, art. 7858; the publication taking place upon the signature of the instrument by testator.

6. Wills ⬦108—Delivery not essential to execution or validity.

Delivery of a will is not essential to its execution or validity.

7. Wills ⬦198—Destruction of revoking will does not revive former will.·

Where an instrument in writing was executed in which in terms it was declared that all wills theretofore made by the writer were revoked, and that instrument was written wholly in the handwriting of the writer, and duly signed by him, it had the effect eo instanti of revoking the former wills, and it would not matter if he afterwards destroyed such revoking will; the former wills being revoked, only a formal statutory republication or re-execution would restore their vitality and validity.

8. Wills ⬦290—Revocation of former by subsequent will not disturbed by presumptions of destruction.

Where the last will of testator was last seen in his possession and could not thereafter be found, the presumption would arise that he had destroyed it, but, if holographic, and it passed into the possession of some one else, then no presumption of destruction on the part of the testator would arise.

9. Wills ⬦289—Execution of subsequent will raises conclusive presumption of intent of testator.

Where a subsequent will was shown to have been executed, the intent of the testator to seriously make it will be conclusively presumed, and that presumption will prevail until it is proven that the instrument was not executed as a will, or was done in an idle moment, with no serious intention that it would have the effect of a will.

10. Wills ⬦324(4) — Where revoking will shown, seriously and deliberately executed intent of testator held not for jury.

The fact that testator wrote a revoking will and signed it and called the attention of others

⬦For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Writ of error granted January 17, 1923.

to it was proof that it was intended to do exactly what its language indicated, and the question of intent was properly not presented to the jury, where there was not a circumstance in proof that tended to show that the instrument was not seriously and deliberately executed for the purposes recited in it.

**11. Wills ⚖══196—Revoked will not revived by mere oral declaration that testator so desired.**

Where a holographic will was executed revoking a former will, and the evidence failed to indicate any desire on the part of the testator to republish the old will, evidence of the mere declaration that the former will was the one testator desired to stand would not revive it.

**12. Wills ⚖══72—Character of paper used in preparing will no evidence of insincerity of testator's intention.**

The size, texture, and quality of paper used in preparing a will is no evidence of the lack of testator's sincerity in its execution, and does not affect its validity.

**13. Appeal and error ⚖══970(1)—Trial ⚖══41 (1)—Exclusion of witnesses from courtroom in civil cases not reviewable, except for abuse of discretion.**

In civil cases it is the settled rule that the question of excluding witnesses from the courtroom so as to prevent them from hearing the testimony of one another is one largely within the discretion of the trial judge, and his action in refusing enforcement of the rule will not be reviewed, unless it is apparent that there has been such an abuse of the discretion as to probably materially interfere with a just and orderly trial of the cause.

**14. Appeal and error ⚖══948—Refusal of exclusion of witnesses from courtroom during criminal trial not error, unless prejudice affirmatively shown.**

While in criminal cases under the statutes the rule as to the exclusion of witnesses from the courtroom during trial when demanded must be enforced, the action of a trial judge in refusing exclusion, unless prejudice is affirmatively shown, will not be cause for reversal.

**15. Evidence ⚖══582(1)—Certified copy of record of testimony on trial of same matter in another court admissible.**

In a will contest, certified copy of evidence of a witness which had been used by proponents in the effort to probate the will in the county court, and which had been duly recorded under Vernon's Sayles' Ann. Civ. St. 1914, art. 3274, was admissible under article 3275 thereof.

**16. Witnesses ⚖══164(3) — Evidence of one married to relative of testator, but not a contestant, admissible in contest proceeding.**

In a will contest, the testimony of a woman who had married a grandnephew of testator, but who was not a contestant, as to seeing a purported will in testator's handwriting, was admissible; the witness having had no transaction with deceased so as to bring her within the statute excluding such testimony.

**17. Wills ⚖══293(1)—Objection to testimony of contestant that she had never had possession of the will held without merit.**

In a will contest, the objection to the testimony of one of the contestants, a niece of testator, that she had never had possession of the will was without merit.

**18. Wills ⚖══306 — Evidence held sufficient to sustain finding of revocation of will by subsequent holographic will.**

In a will contest, evidence that testator, a man of decided convictions and strong will and intelligence, expressed several months before his death to his attending physician his intention and desire to change his will, and of similar expressions of such intention to his attorney, supplemented by evidence that testator prepared a holographic will which by its terms revoked the former will, *held* sufficient to sustain the finding denying the probate of the former will.

Appeal from District Court, Bexar County.

In the matter of the estate of George W. Brackenridge, deceased. Proceedings by M. E. Brackenridge to probate decedent's will. From an order denying the probate, proponent appeals. Affirmed.

Denman, Franklin & McGown, F. C. Davis, and Marshall Eskridge, all of San Antonio, W. A. Keeling, of Mexia, E. F. Smith, of Austin, and Tom L. Beauchamp, of Paris, for appellant.

H. P. Drought and Boyle, Ezell & Grover, all of San Antonio, for appellees.

FLY, C. J. This appeal was perfected to this court by M. E. Brackenridge and the state of Texas from an order of the Seventy-Third district court of Bexar county, denying the probate of a will purporting to be the last will and testament of George W. Brackenridge, which order was made on a contest of the will, instituted by Isabella H. Roberts and Isabella H. McIntyre in the county court of Bexar county. On January 17, 1921, the will was filed and offered for probate by M. E. Brackenridge, only sister and nearest relative of the testator. On February 11, 1921, the contestants, appellees in this court, filed their opposition to the probate of the will, denying that it was the last will of said George W. Brackenridge. The state of Texas intervened in the contest, alleging an interest in the probate of the will by reason of a bequest therein to the university of the state. Upon a hearing of the contest in the county court, it was adjudged that the will be probated, and the cause was appealed to the district court, where it was submitted to a jury on the two following issues:

"(1) Did the said George W. Brackenridge, during the latter part of the year 1920, write an instrument in pencil and sign the same con-

taining words to the effect that he revoked all previous wills made by him?

"(2) Was such instrument wholly written by the said George W. Brackenridge in his own handwriting?"

Both of the issues were answered in the affirmative, and upon such answers a judgment was rendered denying probate of the will. The will and various codicils were of dates anterior to December, 1920, and the proof showed that in December, 1920, a holographic will, or declaration in writing, was executed by George W. Brackenridge absolutely and expressly revoking any and all wills and codicils theretofore made by him.

[1] The statute provides that no will, in writing, made in conformity with the provisions of the law, nor any clause or devise therein, shall be revoked except by a subsequent will, codicil, or declaration in writing, executed with like formalities or by the testator destroying, canceling, or obliterating the same or causing it to be done in his presence. Article 7859, Rev. Stats. These are the only methods by which a will, once executed in the statutory manner, can be revoked, and whenever the claim is made that a will has been revoked, it must be supported by proof that one of the methods of revocation commanded by the statute had been used. The statute is mandatory, clear, and explicit, and a will, once executed according to law, cannot be revoked, except in one of the ways prescribed by the statute. Morgan v. Davenport, 60 Tex. 230; Kennedy v. Upshaw, 64 Tex. 411; Hawes v. Nicholas, 72 Tex. 481, 10 S. W. 558, 2 L. R. A. 863; Evans v. Evans (Tex. Civ. App.) 186 S. W. 815.

[2] It does not require the execution of a new will to revoke a former will, but that is one way of several in which a revocation can be effected. This is made so clear and plain by the language of the statute as to leave no room for argument or contention. It is clearly provided that wills can be revoked by a subsequent will, by a declaration in writing, executed with like formalities, or by the testator destroying, canceling, or obliterating his former will, or causing it to be done in his presence, which of course would cause it to be his own act. In order to constitute a declaration in writing a revocation of a will, it should either be signed by the testator and be attested by two or more credible witnesses above 14 years of age, or by a declaration written wholly by the testator. The declaration in writing may be a part of an instrument purporting to be a will, and while it may fail as a will it may meet the demands of the statute as a declaration in writing, which will revoke a former will.

This matter was fully considered by this court in the case of Dougherty v. Holschei-

der, 40 Tex. Civ. App. 31, 88 S. W. 1117. In that case Welder had executed a will making certain bequests, and about 2 years after its execution he wrote a letter to James R. Dougherty, his attorney, in which he stated that he expected on the following day to undergo an operation, and directing a disposition of his property, totally repugnant to the former will, in case he died under the operation. The will, as evidenced by the letter, in the handwriting of the writer, was held to be a contingent will, and, as the writer of the letter survived the operation and lived for 2 years thereafter, it was held that the letter became ineffective as a will. But it was also held that the letter—

"evidenced in no uncertain way that it was the desire of the testator to revoke the former will, and if it was a compliance with the terms of the statute in regard to the revocation of wills, it destroyed the first will the moment it was published, regardless of it afterward being annulled."

After a full discussion as to the effect of the revocation of a will by subsequent repugnant disposition of the property and by express revocatory words, on which subject there is a conflict of decisions, it was held that the former will was revoked, although the disposition of the property desired by the letter did not become effective.

[3] Under the terms of article 7859, Revised Statutes, it is not necessary that a writing expressly revoking former wills should make a disposition of the property previously devised, because the subsequent writing need not be a will, and an instrument purporting to be a will, but inoperative in other respects, may be operative as a revocation of a former will. Alexander on Wills, pp. 721, 722, § 532; Laughton v. Atkins, 1 Pick. (Mass.) 535; Sisters of Charity v. Kelly, 67 N. Y. 409.

When a revocation has once taken place, it is the rule in most states that it can be republished or revived only by re-execution according to formalities fixed by statute. Alexander on Wills, p. 768, § 564, and authorities cited in footnote; Dudley v. Gates, 124 Mich. 440, 83 N. W. 97, 86 N. W. 959; Pickens v. Davis, 134 Mass. 252, 45 Am. Rep. 322.

[4, 5] In Texas the publication of a will, not holographic, is made by the testator signing the instrument and requesting the attestation of two or more witnesses over 14 years of age by subscribing their names thereto in the presence of the testator. Article 7857, Rev. Stats. In the case of a will wholly written by the testator the attestation of the subscribing witnesses may be dispensed with. Article 7858. When a will like the last described is executed, the publication takes place upon the signature of the testator being appended to the instrument. The provisions as to holographic wills were evidently enacted to enable a person

to prepare his own will, when he cannot procure the assistance of others, and to permit him to keep secret the fact that he has made a will or the disposition that he desires to make of his property after his death. These objects would be defeated if witnesses were required in order to validate the will, and the execution of the will with full compliance with the statute is sufficient publication.

[6] This view is fully sustained in the case of Ainsworth v. Briggs, 49 Tex. Civ. App. 344, 108 S. W. 753, in which a holographic will, which it would seem no one had seen except the maker of it, was found among a number of old letters and circulars and other papers of no value on a table located in the room in which the testator died. No one appeared to have ever seen or heard of the will until it was so discovered, but the Court of Civil Appeals of the Third Supreme Judicial District, through Judge Key, held that the will should be probated in preference to an older one found among valuables in a trunk. Delivery of a will, unlike a deed, is not essential to its execution or validity.

[7] In the case of Hawes v. Nicholas, 72 Tex. 481, 10 S. W. 558, 2 L. R. A. 863, it was held:

"A written declaration properly executed as effectually revokes a will from the date of its execution as does its destruction. If the purpose to revoke is sufficiently expressed and the writing is properly executed it cannot be controlled or limited by the name given the instrument, or by its containing other provisions."

If the evidence in this case showed, as found by the jury, that George W. Brackenridge executed an instrument in writing on the ——— day of December, 1920, in which in terms it was declared that all wills theretofore made by him were revoked, and that instrument was written wholly in the handwriting of said Brackenridge and duly signed by him, it had the effect eo instanti of revoking said wills, and it would not matter if he afterwards destroyed such revoking instrument, the former wills were revoked, and only a formal statutory republication or re-execution would restore their vitality and validity. Destruction of the revoking will does not have the effect of reviving the former will. Doctrine contrary to this has never been promulgated by courts except in states in which the statutes on the subject of revocation confine revocations to the execution of another will or destruction of the first will. We have seen no decision from any state where the statute on the revocation of wills is similar to the statute of this state, which disagrees with the rules announced in the cited case of Hawes v. Nicholas, although it is incorrectly stated in 3 Rose's Notes on Texas Reports, p. 951, that the decision is disapproved in Stetson v. Stetson, 200 Ill. 608, 66 N. E. 263, 61 L. R. A. 258. On the other hand, it is stated in

that case that the Texas decision is in line with the decisions of other states having similar statutes to ours. The Illinois court said:

"There are cases, which hold, and many of the text-books indorse and sustain the holdings of such cases, that, where a person, having made a will, afterwards makes another will, containing a clause expressly revoking all former wills, and afterwards destroys the second will, and dies, leaving the former will uncanceled, the revoking clause operates instantaneously to effect a revocation, and that, consequently, the destruction of the second will does not revive the former one."

The court cited text-books and a number of decisions of other states, among the number Hawes v. Nicholas, and stated, after discussing a number of authorities:

"In Texas, also, where the doctrine seems to prevail that the destruction of a duly executed will, containing an express revocation of a former will, does not have the effect of reviving the former will, the statute provides that a will may be revoked 'by subsequent will, codicil or declaration in writing executed with like formalities,'" etc.

The statute of Illinois is different and the decision is based on that statute. There is no word of disapproval of the Texas decision, which is supported by the decisions of Connecticut, Michigan, Massachusetts, Maryland, Georgia, and other states.

In this case there was no effort or desire to probate the second will, but its existence was made the subject of proof merely to show that it contained a full, explicit revocation of a former will, and if those matters were proved the revocation was an accomplished fact, no matter what disposition of the property of the testator was made in the revoking will. Underhill on Wills, p. 361, § 266. The Illinois cases, based on an Illinois statute, are no criterion by which to pass on a revocation in Texas, but it must be viewed in the light of Texas statutes and Texas decisions. Under the Texas statute the former will was revoked by the express declaration to that effect in the instrument, regardless of whether it made any disposition of the property or not. The revoking clause having been proved to the satisfaction of the jury, no other portion of the instrument was of any importance. The revoking clause, as sworn to by the witnesses, was full and explicit, and no greater force or strength could have been given by a detailed account of every provision of the will. It is not required by any statute that, in order to swear to any part of an instrument purporting to be a will, the witness must have read the whole of the instrument, but the contrary has been held in decisions of this state. Buchanan v. Rollings (Tex. Civ. App.) 122 S. W. 962. In that case a holographic will was proven by witnesses who had never

read any of it, and who had heard only parts of the will read to them by the testator. To the same effect is the case of Clover v. Clover (Tex. Civ. App.) 224 S. W. 916, decided by this court and approved by the Supreme Court.

[8] Under the facts found by the jury to be true in this case, if the last will written by George W. Brackenridge was last seen in his possession and could not thereafter be found, the presumption would arise that he had destroyed the will, but he had fully executed it, and no subsequent destruction of it could revive the former will expressly revoked by it. If, however, the facts indicated that the holographic will passed into the possession of some one else, then no presumption of destruction on the part of the testator could arise, but the fact of revocation of the former will would remain unchanged. McElroy v. Phink, 97 Tex. 147, 76 S. W. 753, 77 S. W. 1025; Scott v. Fink, 45 Mich. 241, 7 N. W. 799; Bruce v. Sierra, 175 Ala. 517, 57 South. 709, Ann. Cas. 1914D, 125. In the last-cited case, the case of Barker v. Bell, 49 Ala. 284, was cited, and the following quotation from it approved:

"The point is made for the proponents that, in order to revoke a will, it is not sufficient that the existence of a subsequent will should have been found by the jury; but it must be found different from the former, with the nature of the difference. The proposition is not correct. One of the ways of revoking a will is by making a subsequent one."

The court in the Bruce v. Sierra Case also held:

"It is true there was no proof of the contents of the second or last will; but the jury could infer from the evidence that the testatrix executed a will subsequent to the one offered for probate, and if this was true this last will was a revocation, under the statute, of the one offered."

So in the case now before this court under the terms of article 7859, proof of the making of a will subsequent to the will offered for probate carried with it a revocation of the will last named, regardless of the provisions of the last will. The statute does not require that a different disposition of the property shall be made from that contained in the former will, but only provides that the execution of a subsequent will, codicil, or declaration in writing, with the proper formalities, will revoke the former will. There was therefore no call or necessity for proof of the contents of the second will, unless it had been propounded for probate. Melhase v. Melhase, 87 Or. 590, 171 Pac. 216; in re Cunningham, 38 Minn. 169, 36 N. W. 269, 8 Am. St. Rep. 650; Wallis v. Wallis, 114 Mass. 510. This is the purport of numerous other decisions, too numerous for citation in this opinion.

[9, 10] When a subsequent will was shown to have been executed the intent of a testator to seriously make the will, will be conclusively presumed, and that presumption will prevail until it is proven that the instrument was not executed as a will, or was done in an idle moment, with no serious intention. that it should have the effect of a will. The very fact that the testator wrote the will and signed it and called the attention of others to it was proof that it was intended to do exactly what its language indicated, and in that state of the facts the question of intent was properly not presented to the jury. There is not a circumstance in proof that tended to show that the instrument was not seriously and deliberately executed for the purposes recited in it. Alexander on Wills, p. 123, § 105.

[11] The evidence fails to indicate any desire upon the part of the testator to republish the old will, and if he had so desired, that desire would not revive the revoked instrument. Appellant seems to contend that, although the testator may have executed the revoking instrument with all the formalities of the law, he could nullify it by declaring afterwards to Dr. Vinson that the former will was the one he desired to stand. In other words, that a revoked will can be revived by a mere verbal declaration that the testator so desired. That has never been the law in Texas. Every contested issue presented by the evidence was given by the court to the jury, and the court did not err in refusing to present the matters desired by appellant to the jury.

If the revoking will was wholly in the handwriting of George W. Brackenridge, and was signed by him, there was no question as to it having been executed with all the formalities of the law, and it would have been unreasonable to have submitted any such matter, and the execution of the instrument evidenced, without controversy, the serious intention of the testator in executing it. Brown v. Avery, 63 Fla. 355, 376, 58 South. 35, Ann. Cas. 1914A, 90.

[12] It would present a farcical state of affairs if it should be assumed, on mere hypothesis, that George W. Brackenridge, in his extreme old age, when his life was divided by an attenuated fragment of space from the shores of eternity, wrote a revocatory will merely to while away the few brief hours left him, or to perpetrate a grim joke. It is assumed by appellant that because a former will had been prepared by a skillful attorney with all the technical paraphernalia of law, in both language, manner, and mode, on stationery dedicated and set apart by custom and experience to wills, that the testator could not seriously have contemplated destroying all that former technical labor expended in preparing the will, and several codicils, by writing on plain, ordinary paper, usually devoted to typewritten letters

and other matter, a will in his own handwriting. No such rule prevails, and the size, texture and quality of paper used in preparing a will is no evidence of levity or desire for amusement upon the part of the testator. In re Fouche's Estate, 147 Pa. 395, 23 Atl. 547.

[13] A bill of exceptions numbered 1 recites that, after the jury had been impaneled, the pleadings of all parties read, and counsel for appellant had made a "lengthy and detailed statement to the jury of the facts that the proponent expected to prove, consisting of 10½ pages of legal cap paper," and had "introduced their testimony in chief, which consisted of the affidavits of Roland Springall, T. D. Anderson, William Eiffler, Thos. H. Franklin, and Nellie Halamuda," and the will and codicils sought to be probated, and had rested, all in the presence of the witnesses for all the parties, who afterwards testified, then counsel for proponent requested the court to place the witnesses under the rule. Appellees objected to the enforcement of the rule because the request for it came too late and the court declined to enforce the rule, and all the witnesses were permitted to remain in the courtroom and testify in the presence of each other. This action of the court is the subject of complaint on the part of the appellants. No provision has been in the statutes of Texas for the enforcement of what is known as "the rule" as to witnesses in civil cases that is to exclude them from the courtroom during a trial in which they are expected to testify under instructions not to talk to any one about what their testimony might be in the case, but the rule is a heritage from the common law which has under certain restrictions and limitations been enforced by the appellate courts of Texas.

The separation of witnesses so that they cannot ascertain the testimony of each other did not have its origin in the English common law, although brought to America through that medium, but it is recorded in the History of Susanna, a book of the Apocrypha, that when two elders had preferred charges against the virtue and fair name of Susanna, a matron of Israel of high degree, Daniel said: "Put these two aside, one far from another, and I will examine them." The witnesses were separated, and in their testimony so contradicted each other that Susanna was vindicated. In that case, reported 2,500 years ago, the circumstances were such as to cast suspicion upon the veracity of the two witnesses and the truth of their accusation, and the discretion which would have denied the granting of the rule would have been a flagrant injustice, but the discretion in that first known case was lodged in the hands of the judges hearing the cause, and so it has ever been lodged.

[14] In criminal cases, under the statutes of Texas, the rule as to witnesses when demanded must be enforced, but under the sanction of decisions of the appellate courts, in civil cases, it is the settled rule that the question of excluding witnesses from the courtroom so as to prevent them from hearing the testimony of one another is one left largely within the discretion of the trial judge, and his action in refusing enforcement of the rule will not be reviewed unless it is apparent that there has been such an abuse of his discretion as to probably materially interfere with a just and orderly trial of the cause. Even under the criminal law, which grants the right to exclude witnesses from the courtroom, the action of a trial judge in refusing such exclusion, unless prejudice is affirmatively shown, will not be cause for reversal. Lowrie v. State (Tex. Cr. App.) 98 S. W. 838; Green v. State, 49 Tex. Cr. R. 645, 98 S. W. 1059.

In the last case cited the Court of Criminal Appeals held:

"The placing of witnesses under the rule, or excusing certain witnesses from the rule for cause, as being officers, etc., is within the sound discretion of the court; and the right to introduce witnesses who have not been placed under the rule is also within the sound discretion of the court. Unless there has been an abuse of this discretion—that is, unless some resultant injury to appellant is shown from an introduction of witnesses who have not been placed under the rule—the case will not be reversed on that account."

In the case of Clary v. State, 68 Tex. Cr. R. 290, 150 S. W. 919, cited by appellants, it was held that the exclusion of the witnesses from the courtroom should have been granted at the request of the defendant, because article 719 of the Criminal Code gave the defendant the right to make such demand, but it was held that as no injury was shown to have resulted to the defendant from a refusal to grant the application to the witnesses of the rule, it was not such error as necessitated a reversal, and an affirmance of a judgment of conviction was made by the court. These decisions in criminal cases, made under a positive statute giving a right to the rule with witnesses, are cited to show that if a sound discretion may be exercised as to granting or refusing to exclude or separate witnesses in criminal cases, the doctrine should prevail with equally as great force in civil cases where the right is given merely by following the common law, and not by any act of our Legislature, and it has been so held in all the appellate courts of Texas.

Great reliance is placed by appellants in the case of Watts v. Holland, 56 Tex. 58, to sustain them in the contention that the court should have placed the witnesses in this case under the rule when the request was made by them, and it is stated that "the facts showing the right to the enforcement of the rule in that case are no stronger than

those in the instant case." A comparison of the facts in the two cases, we believe, will not support that assertion.

In the Watts-Holland Case, John M. Holland sought to establish the making of a nuncupative will by Hiram P. Ferrill, which purported to devise to Precilla Ferrill certain property, and appointing the plaintiff, Holland, the executor. Holland testified to facts as to the making of the will. Eliza Watts, sister of deceased, contested the alleged will. The other witnesses to sustain the nuncupative will were the mother and stepfather of the alleged devisee, Precilla Ferrill. Deceased died in their house. ¡The contestant, Mrs. Watts, alleged a conspiracy between the plaintiff and the relatives of Precilla to fabricate a will. The court held that a nuncupative will would not devise real estate, but for some reason, not apparent, proceeded to remand the cause for another trial. It may have been because there was personal property involved which should be administered. The court further held that the trial court erred in refusing to put Holland and the Ferrills under the rule on the motion of contestant asking that it be done. The facts in the case clearly showed that the mother and stepfather, and the alleged executor were vitally interested in probating the will; that the greatest opportunity was presented for concocting and consummating a fraud under circumstances which it was almost impossible to detect, and the circumstances were such as to clearly show an abuse of his discretion by the judge in refusing to enforce the rule. In this case the two main witnesses upon whom the contestants relied to establish a revocation of the will sought to be probated by proponent were Mrs. Peeler, who is the wife of a grandnephew of the deceased, and Mrs. Mitchell, who was not related to any of the parties or witnesses. There was no allegation of fraud or a combination between Mrs. Peeler and Mrs. Mitchell to swear to facts establishing a revocatory instrument. There was nothing developed on the trial pointing to or indicating any such conspiracy or combination between the witnesses. It is true that Mrs. Peeler was interested in defeating the will offered for probate, but Mrs. Mitchell was not shown to have the least interest in the outcome of the contest—either directly or indirectly. The evidence of the two witnesses fails to furnish any indicia of collusion or fraud, and there is no such similarity in the testimony of the two women as would tend to show an agreement between them to support each other in their statements. Mrs. Mitchell testified as to more details than did Mrs. Peeler, and most of the evidence of the two women was as, to matters occurring when they were not together, and as to which they could not, had they desired, corroborate each other.

[15] Dr. Mary Harper was a physician who accompanied George W. Brackenridge on a trip in the summer of 1920, and her testimony was embodied in a deposition taken by proponent of the will and used by her in the county court, and a portion of the same deposition was used by contestants in the district court over the objections of proponent. Appellees introduced a certified copy of the testimony of Dr. Harper, which had been used by appellants in the effort to probate the will in the county court, and which had been duly recorded under the provisions of article 3274, Vernon-Sayles Stats. In article 3275 it is provided:

"A certified copy of such record of testimony may be read in evidence on the trial of the same matter in any other court when taken there by appeal or otherwise." Perdue v. Perdue, 110 Tex. 209, 217 S. W. 694, 220 S. W. 322; Cook v. Denike (Tex. Civ. App.) 216 S. W. 437.

Even though improper as original evidence when introduced by appellants in the county court and recorded, appellees had the legal right to use it. We do not hold, however, that the testimony was not admissible as original evidence. The sixth assignment of error, with its points, is overruled.

[16] The seventh assignment of error is voluminous and is confusing, but it seems that the assignment is aimed at the testimony of Mrs. Peeler that she knew the handwriting of George W. Brackenridge, and that she saw a white sheet of paper, written in the handwriting of George W. Brackenridge, lying on his desk, saw his signature at the bottom and dated 1920, and read from the paper:

"I, George W. Brackenridge, make this my last will and hereby revoke former wills made by me."

She stated that Col. Brackenridge was sitting at his desk, and the paper was on his desk. Mrs. Peeler married a grandnephew of the deceased, but was not a contestant. The only objections urged to Mrs. Peeler's testimony that require consideration are that she was an interested party and a proper party to the action, and that she could not, under the law, testify to any transaction with the deceased. The objections were properly overruled. Witness had no transaction with deceased so as to bring her within the purview of the statute.

[17] In the eighth assignment of error it is urged that the court erred in allowing appellees to ask appellee Isabella Roberts, one of the contestants, and a neice of George W. Brackenridge, deceased, if she had any conversation with, decedent about his last will, and when this was answered in the affirmative to ask her what the conversations were, and when objection was made the court sustained them. Then witness was asked if any instrument in writing was, shown her by de-

ceased in December, 1920, and this was objected to, and objection overruled. Appellees' counsel stated that they did not expect any objection to the question, but if objection was made, they would withdraw it, and try to state it in an unobjectionable form. The witness was then asked if she ever had possession of the will to which the other witnesses had sworn, and, objection being made and overruled, the witness answered that she never had possession of the will. What objection appellants could possibly have had to the testimony has not been made apparent by the record, unless it was that they were fearful that appellees might mention something in their argument about questions that were withdrawn by them. The eighth assignment is totally without merit, and is overruled. To a similar effect is the ninth assignment of error, and it is overruled.

Assignments of error 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28 and 29 relate to issues submitted and refused and have no merit. Most of them are very general, vague, and indefinite, being induced probably by the conclusion that the so-called new rules have set aside every rule heretofore formulated to assist the appellate court in arriving at a conclusion, and there may be a basis for that position. This court concludes that every necessary and appropriate issue was submitted by the court, and that the answers to the issues were fully sustained by the proof, and therefore we overrule all of the remaining assignments of error from the thirtieth to the eighty-eighth, inclusive.

[18] The facts in this case show that George W. Brackenridge was a man of decided convictions and a strong will, backed by virile determination and intelligence, which were not abated or impaired by his more than four score years of existence and up to the hour of his death. For several months before his death, which occurred on December 28, 1920, he had expressed to his attending physician and other intimate friends his desire to change his will, which was not in accord with his wishes. He went to his place of business, where his will, with several codicils, was deposited for safe-keeping, and took those instruments to his home at the outskirts of the city of San Antonio. As far back as 1917 or 1918, Col. Brackenridge had contemplated making changes in his will, and so informed one of his attorneys. In fact, the attorney prepared a will which he did not sign, but "said he would take the will with him, and if he did want to execute it he would copy it in his own handwriting." The attorney advised, or rather "warned him that if he did so, to have it wholly in his own handwriting, and make such changes as he saw fit." After telling his physician several times on the trip made in the summer of 1920 that he wanted to get back and makes changes in his will, Col. Brackenridge returned to his home and in the early part of December, previous to December 18, 1920, the physician testified that he showed her a package of papers in which he said his will was contained. Dr. Harper swore that the nurse, Mrs. Mitchell, got the package of papers, at the request of deceased, out of a drawer in his desk, and handed it to him and:

"He just looked at it; he did not open the papers, but just looked through them—pulled the papers this way to see what was in the package and then handed it back to Mrs. Mitchell, and she put it back in the drawer."

Another attorney said he discussed the will with Col. Brackenridge in August, 1918, and also two or three months before his death, and that at the last conversation the attorney suggested that the will should be rewritten, to which deceased replied:

"Well, I want to keep it out here a while and go over it, there are some things about that colored school down there in Guadalupe county that I am thinking about, and so I will just keep it out here for a while."

The attorney stated that he never said anything about the will again to deceased until he learned that deceased had a weak heart, when he said to the latter:

" 'Mr. Brackenridge, you have never sent your will back down to the Loan & Trust Company for safe-keeping, have you?' and he said, 'No; I have got it here.' "

The evidence points strongly to the fact that Col. Brackenridge had it in mind to the time of his death, as he had it in 1918, that his will should not be prepared by an attorney, but that he would, as he told his attorney, prepare it himself in his own handwriting. The testimony conclusively shows that he never wavered from that purpose, but carried it into execution, and that he was speaking of the will written and signed by him, which was seen by Mrs. Peeler and Mrs. Mitchell, which expressly revoked all other wills made by him, and that he was speaking of that will when he told Dr. Mary Harper that his will was in the package of papers shown to her. This was to reveal to her that he had done what he had told her in the summer he intended to do. Mrs. Mitchell, who was, and had been for over 2 years, the trusted, confidential nurse of Col. Brackenridge, testified that she had read the will of 1913, which appellants are seeking to probate, twice to Col. Brackenridge, and heard Dr. Vinson read it to him. She read the will after it was brought to his home by the deceased in September, 1920, and after the last visit made by Dr. Vinson to Col. Brackenridge, and she further testified:

"I believe it was along about the 12th of December that he said he had decided all along that he would rewrite his will, and he at that

time commenced to rewrite one—to write a new will."

Afterwards he told Mrs. Mitchell that the only way to write a will was to write in your own words in your own way, and that you should write it in your own handwriting. The witness had her attention called to a will written in pencil by the conversation of the testator, and read the heading and read the first part of the will, in which all other wills were revoked, and saw his signature at the bottom of it. She swore she saw it several times, saw the last will, and it was put in an envelope with a will dated 1908 and one dated 1913, and the last time she saw it was on December 16 or 17, when Dr. Vinson paid his last visit, and after he had left the room she saw Col. Brackenridge looking at the will written by him in his own handwriting. The will was entirely in the handwriting of and was signed by George W. Brackenridge. The witness put that will with the package of papers and on the Tuesday before he died she saw the testator give the package of papers to his sister, Miss Eleanor Brackenridge, who is the proponent of the will of 1913. Mrs. Peeler also saw the last will. Miss Brackenridge stated that about December 25, 1920, the papers were given to her by her brother, who said he did not want anybody to see them, but wanted them put in her lock box. She did this. Others had access to her lock box, and the papers were taken by Anderson and Thos. H. Franklin to the Brackenridge home after the death of Col. Brackenridge. Anderson had a key to the lock box of Miss Brackenridge.

The will of 1908 and that of 1913, and the various codicils were documents known to several attorneys and others connected with the Loan & Trust Company, and it is plain that George W. Brackenridge could not have had them in mind when he told his sister not to let any one know about the papers. He evidently did not wish for an attorney to prepare a new will, for he refused suggestions that it should be so prepared, and took his old wills from their place of deposit and kept them by him until about three days before his death, when he requested Mrs. Mitchell to get them out of the drawer of the desk and give them to his sister. Mrs. Mitchell was not contradicted on any material point, and wherever the testimony of any witness came in contact with hers it tended to corroborate her. The testimony of Mrs. Peeler, of Miss Brackenridge, of the negro, Ivy Neal, and other witnesses all tended to corroborate her testimony. There was no evidence of collusion or conspiracy between her and Mrs. Peeler, but the latter swore to independent facts tending to show the truth of her testimony. Mrs. Mitchell had no interest in the estate, and was not related to any of the parties, and seemed to desire to steer clear of the family difficulty and not testify in the cause. There is ample evidence to show that a revoking will was executed by George W. Brackenridge in the early part of December, 1920; that it was placed among the other papers by Mrs. Mitchell and the package was delivered by her to Miss Brackenridge. What became of the revocatory instrument was not revealed, but it was executed, and, while its value as a will may have been destroyed forever, the revocation took effect, and no loss or destruction could affect that revocation. It had the effect, when lost or destroyed with no proof of contents remaining, of causing a man to die intestate who had for years been preparing wills and codicils. It seems to be the bitter irony of fate that intestacy should follow.

The judgment is affirmed.